**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION**

|  |  |  |
|---|---|---|
| CLAUDIA M. MORA, et al. | : | |
| | : | Civil Action No.: 8:16-cv-00960-PX |
| Plaintiffs/Counterclaim Defendants, | : | |
| | : | |
| v. | : | |
| | : | |
| LANCET INDEMNITY RISK RETENTION | : | |
| GROUP, INC., et al. | : | |
| | : | |
| Defendants/Counterclaim Plaintiffs. | : | |
| | : | |

**DEFENDANT/COUNTERCLAIM PLAINTIFF LANCET INDEMNITY RISK
RETENTION GROUP, INC.'S MEMORANDUM SUPPORTING CROSS MOTION FOR
SUMMARY JUDGMENT AND OPPOSING PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT**

COZEN O'CONNOR, P.C.

Chad E. Kurtz (Bar No. 14102)
1200 19th Street NW, Suite 300
Washington, DC 20036
Tel: (202) 463-2521
Email: ckurtz@cozen.com

John David Dickenson (*admitted pro hac vice*)
Matthew B. Criscuolo (*admitted pro hac vice*)
One North Clematis Street, Suite 510
West Palm Beach, FL 33401
Tel: (561) 515-5250
Email: jdickenson@cozen.com
Email: mcriscuolo@cozen.com

*Attorneys for Defendant/Counterclaim Plaintiff,
Lancet Indemnity Risk Retention Group, Inc.*

Dated: September 9, 2016

LEGAL\27887376\3

**Table of Contents**

Page

I.    INTRODUCTION AND FACTUAL BACKGROUND ..................................................... 1

   A.   Risk Retention Group background ................................................................... 2

   B.   The medical professional liability insurance policy issued to Dr. Malik's medical companies contains robust cooperation obligations and requires Dr. Malik's involvement in the defense of claims ................................................................................. 3

   C.   Dr. Malik is the only person with knowledge of Castillo's single visit to Advanced Walk-In. ...................................................................................................................... 6

   D.   Lancet diligently sought to obtain the Insureds' cooperation in the defense of Plaintiffs' medical malpractice action. ....................................................................... 8

   E.   Procedural history ............................................................................................ 11

II.   LEGAL ARGUMENT .......................................................................................... 11

   A.   Standard of review on a summary judgment motion ........................................ 11

   B.   Interpretation of insurance policies under Maryland law ................................. 12

   C.   The Court should declare that the Policy does not provide coverage because the Insureds' failure to cooperate prejudiced Lancet. ........................................................... 12

      1.   Plaintiffs concede that the Insureds utterly failed to cooperate in the defense of the medical malpractice action. ........................................................................ 13

      2.   The Insureds' non-cooperation prejudices Lancet. ..................................... 13

         **a.   To establish actual prejudice, Lancet need only show that the Insureds' non-cooperation precludes or hampers Lancet from presenting a credible defense.** 14

         **b.   Medical professional liability claims are uniquely reliant upon the cooperation of the medical professional.** ........................................................... 17

   D.   The Insureds' failure to provide notice of Plaintiffs' claim to Lancet, by itself, eliminates coverage under the Policy. ............................................................................ 24

      1.   Federal Law Preempts Maryland Code Section 19-110. ............................. 24

      2.   Even if not Preempted, Section 19-110 Does Not Apply to the Insureds' Claims-Made and Reported Policy. ................................................................................. 26

LEGAL\27887376\3

3.   Even if not preempted, and even if Section 19-110 applies, Lancet has demonstrated the actual prejudice it suffered as a result of the Insureds' failure to provide notice of Plaintiffs' claim to Lancet. ........................................................................................ 29

III.   CONCLUSION ........................................................................................................ 30

## I.      INTRODUCTION AND FACTUAL BACKGROUND

This is a highly unusual case of extreme lack of cooperation on the part of an insured.  It is undisputed that Lancet Indemnity Risk Retention Group's ("Lancet") insureds entirely failed to cooperate in the defense of the underlying matter.  It is further undisputed that, despite seven months of repeated attempts contact its insureds, Lancet has not received a single instance of contact from its insureds in relation to this, or any other claim.  It is undisputed that Dr. Ishtiaq Malik ("Dr. Malik") has fled the United States and returned to his native country of Pakistan.  It is undisputed that Dr. Malik and his entities have entirely failed to meet their obligations under the subject medical professional liability policy.  Lancet has been incurably prejudiced by the undisputed absence and lack of contact from Dr. Malik, the sole treating physician at issue.

Lancet issued a medical professional liability insurance policy (the "Policy") to two medical companies belonging solely to Dr. Malik. On January 15, 2015, Juan Castillo ("Castillo") went to see Dr. Malik because of chest pain.  Castillo died of a heart attack eight days later.  In July of 2015, Plaintiffs filed a professional malpractice action against a number of medical providers, including Dr. Malik's entities.

It is undisputed that Lancet has never, at any time, received any contact from its insureds regarding the alleged malpractice claims.  Lancet only became aware of the allegations against its insured as a result of direct communication from Plaintiffs' counsel, beginning in July of 2015.  Lancet immediately appointed defense counsel and, over the next seven months, repeatedly tried to contact Dr. Malik and his companies but never received a single response.  During the course of its pursuit of its insureds, Lancet later learned that Dr. Malik left the United States in the spring of 2015 and has returned to his native Pakistan, showing no signs of returning.

The undisputed and extreme non-cooperation of its insureds prejudices Lancet because Dr. Malik is the lone surviving witness to Castillo's single medical visit.  Without any contact from Dr. Malik, Lancet has been unable to determine exactly what occurred at the one visit other than what is contained in a terse, vague medical note and thus whether there exists a credible defense to Plaintiffs' claims.  After an exhaustive search for Dr. Malik, Lancet denied coverage due to non-cooperation (and failure of notice), Plaintiffs filed this declaratory judgment action and Lancet counterclaimed. On the basis of numerous Policy provisions discussed herein, the Court should declare that Lancet does not owe coverage to the insureds for Plaintiffs' claims and that the Policy is void for lack of cooperation.

### A.      Risk Retention Group background

Lancet is a risk retention group ("RRG") organized pursuant to the Liability Risk Retention Act (the "LRRA"), 15 U.S.C. § 3901 *et seq.*  As a RRG, Lancet is principally regulated by the federal LRRA, with only limited regulation from certain state insurance laws. *See* 15 U.S.C. § 3902.  Lancet's status as a RRG is demonstrated by the LRRA mandated disclosure on the face of the Policy at issue in this matter.[1]

RRGs are a variety of captive insurance.  Consistent with the general purpose of risk retention groups (i.e., to expand the insurance market beyond the products offered by traditional insurance companies), *see Mears Transp. Grp. v. State*, 34 F.3d 1013, 1017 (11th Cir. 1994) (noting the "wider application" of the LRRA through the 1986 amendment to the LRRA), Lancet is a small company that offers insurance products to the same insureds who own and finance Lancet.  The LRRA states that the primary purpose of a RRG is to assume and spread the commercial liability of its members.  *Id.*  The LRRA further requires that the RRG be owned by its insureds and requires that the insureds have similar or related liability coverage.  *Id.*

---

[1] Exhibit A.

Lancet insures only medical professionals.  Accordingly, unlike a traditional insurance company, Lancet is owned and funded by its own insureds, i.e. physicians.  *See* 15 U.S.C. § 3901(a)(4).  Physicians direct Lancet and, importantly, physicians helped to write the Policy at issue and design the coverage provided by that Policy.  These physicians know what it takes to defend other physicians against medical malpractice claims, and they have built those requirements, including robust cooperation language, into the manuscript[2] Policy purchased by Dr. Malik.

> **B.** **The medical professional liability insurance policy issued to Dr. Malik's medical companies contains robust cooperation obligations and requires Dr. Malik's involvement in the defense of claims.**

In 2014, Lancet issued a claims-made-and-reported Policy, such that, for there to be coverage a claim must be both made against the insureds and reported to Lancet within the Policy period.[3]  The Policy period was July 1, 2014 through July 1, 2015, with an extended reporting period through July 31, 2015.[4]  The named insureds under the Policy are Union Multi-Care Medical Center, Inc. ("Union Multi-Care") and Advanced Walk-In Urgent Care, LLC ("Advanced Walk-In").  Dr. Ishtiak Malik, a nuclear cardiologist, is listed as an additional insured (together, the "Insureds").[5]  Dr. Malik was the president of Union Multi-Care and Advanced Walk-In and the primary physician.[6] Dr. Lendicita Madden was the only other

---

[2] A "manuscript" policy is an insurance policy form that is custom designed for a particular type of insured.  *See Insurance Risk Management Institute* definition at https://www.irmi.com/online/insurance-glossary/terms/m/manuscript-form-or-policy.aspx

[3] Exhibit A., *Id.*, Inclusive Policy, at 1.

[4] *Id.*, Declarations & Endorsements, at 1; *id.*, Inclusive Policy, at 19, § 19.

[5] *Id.*, Declarations & Endorsements, at 1, 11; Exhibit B, Deposition of Isis Diaz ("Diaz Dep."), at 33:9-10.  Dr. Lendicita Madden is also an additional insured.

[6] Ex. A, Policy, Declarations & Endorsements, at 1; Exhibit C.

physician working at the Insureds during the relevant time period.[7]   It is undisputed that Dr.

Malik was the only physician that saw Castillo.[8]

The following relevant Policy provisions pertain to the Insureds' obligation to assist and

cooperate with Lancet in the defense of any claims asserted or lawsuit filed against them:

> *25. Cooperation and Assistance*
>
> *The Insured must cooperate and assist the Company and the appointed defense counsel in all aspects of the investigation and defense; and shall, upon request, submit to examination and interrogation by a representative of the Company, under oath if required, attend hearings, depositions and trials, assist in effecting any settlement, securing and giving evidence, and obtaining the attendance of witnesses, all without charge to the Company.*
>
> *The Insured shall further cooperate with the Company to do whatever is necessary to secure and affect any rights of indemnity, contribution or apportionment that the Insured may have. Any failure of the Insured to cooperate that prejudices our ability to defend any Claim, shall void this Policy, nullify coverage and will disqualify the Insured from being eligible to exercise the option to purchase an Extended Reporting Period endorsement.*
>
> *2. Defense and Settlement*
>
> *We will not settle any Claim without your consent.   We may, with your written consent in a form acceptable to us, settle any Claim for any monetary amount that we consider reasonable.*
>
> *...*
>
> *The Insureds will provide full cooperation and all information and particulars that we may request to conduct an investigation, defend a Claim or to reach a settlement of the Claim. The Insureds agree that, in the event of a Claim, they will do nothing that may prejudice our position or rights of recovery.* [9]
>
> *...*

---

[7] Exhibit D, Deposition of Lendicita Madden ("Madden Dep."), at 6:18-20, 7:6-14, 9:1-10.
[8] Ex. D, Madden Dep., at 21:10-13.
[9] Ex. A, Policy, Inclusive Policy, at 3, § 2, § 21, § 25 (Policy language *italicized*, all other emphasis removed).

The following additional policy provisions have relevance to the undisputed facts of this matter and the relief sought in this Cross Motion for Summary Judgment.  The relevant Notice Provisions section states notice must be provided by an "insured" and must contain a detailed list of items set forth in the Notice provision.[10]

> *Duties in the event of a **Claim or Occurrence:***
>
> *Notifying us of an Occurrence or Claim does not provide coverage hereunder unless it contains:*
>
> *(a)      written notice received by an Insured, and forwarded to us, from a person or entity, or on behalf of such person or entity by another party legally empowered to act on their behalf, alleging that such person or entity has been damaged by an Insured and demanding monetary damages or notifying the Insured of an intention to hold an Insured responsible for an Occurrence; or*
>
> *(b)      the filing of a civil lawsuit or arbitration proceeding seeking monetary damages.*
>
> *ONCE AN INSURED RECEIVES THE ITEMS STATED IN A) OR B) ABOVE, IT IS A CONDITION PRECEDENT TO YOUR RIGHTS UNDER THIS POLICY, THAT YOU GIVE US IMMEDIATE WRITTEN NOTICE THEREOF AND PROVIDE US WITH COPIES OF ALL DOCUMENTATION COMPRISING THE CLAIM AS WELL AS ALL AUTHORIZATIONS, COOPERATION AND ASSISTANCE AS WE MAY REQUIRE, ALL WITHOUT DELAY.*
>
> *NOTICES TO THE COMPANY SHOULD INCLUDE (A) THE IDENTITY OF THE POTENTIAL CLAIMANT; (B) THE IDENTITY OF ALL INSURED(S) INVOLVED IN THE OCCURRENCE; (C) THE IDENTITY OF ANY WITNESS(ES) TO THE MATTER; (D) THE DATE, TIME, LOCATION AND A GENERAL DESCRIPTION OF THE CIRCUMSTANCES OF THE OCCURRENCE, INCLUDING A DESCRIPTION OF THE POSSIBLE INJURIES OR DAMAGES; (E) THE MANNER IN WHICH THE INSUREDS FIRST BECAME AWARE OF THE*

---

[10] *Id.*, Inclusive Policy, at 8, § 6 (emphasis removed).

*CIRCUMSTANCES; AND (F) THE REASON THE INSUREDS BELIEVES A CLAIM HAS BEEN OR MAY BE MADE.*

*Defense Costs incurred by us upon receipt of notice of an Occurrence will be considered to be part of the Claim in the event that a Claim does become properly made and reported under this Policy. We may also seek reimbursement for any such Defense Costs that are or would be part of the Deductible.*

*We are not obligated to pay any Defense Costs incurred prior to a Claim being first made and reported in accordance with this Policy.*

*Claims and any other notices must be advised by certified mail, overnight delivery or acknowledged fax to:*

> *Lancet Indemnity Risk Retention Group Inc.*
> *2810 W. St. Isabel Street Suite 201B*
> *Tampa, Florida 33607*
> *Phone: (877) 370-2262*
> *Fax: (813) 290-7070*

*Notices to the Insured(s) are deemed to have been correctly advised if sent by mail to the Primary Insured at the address stipulated in the Declarations.*

Each of these provisions expressly requires contact from, and the direct involvement of, the physician insured.  In fact, pursuant to the Defense and Settlement provision, Lancet is contractually prohibited from discussing the settlement of any suit without the prior written consent of its physician insured.[11]  In short, Lancet is unable to investigate, defend, settle, or otherwise respond to any claim without the involvement and participation of its physician insured.

### C.     Dr. Malik is the only person with knowledge of Castillo's single visit to Advanced Walk-In.

On January 15, 2015, Castillo presented at Advanced Walk-In due to chest pain and was seen by Dr. Malik.[12]  Per a brief, two-page consultation note, Dr. Malik performed a

---

[11] Ex. A, § 2.
[12] Ex. D, Madden Dep., at 21:10-13.

6

cardiovascular stress test and EKG on Castillo.[13]   A stress test normally lasts for four or five minutes; Castillo's test was stopped after about three minutes.[14]   The consultation note states in pertinent part:

> ### History of Present Illness
> <u>constitutional:</u>
>> c/o atypical chest associated with SOB few times a day get worse with lefting [sic] of heavy stuff or running too hard.
>
> . . .
>
> ### Treatment
> *1. Chest Pain, other.*
> *Start Metoprolol Succinate ER Tablet Extended Release 24 Hour, 25 MG, 1 tablet, Orally, Once a day, 30 day(s), 30*
>
> ### Procedures
> <u>Exercise Stress Test:</u>
>> *Indication(s) chest pain. Protocol Bruce protocol. Procedure resting EKG obtained, reason for stopping the test-chest after 3 minutes.*[15]

The only medical records relating to Castillo's visit that have been discovered are the consultation note and a stress test printout.[16]   No one has been able to locate the report usually generated from a stress test printout or the EKG printout and/or report,[17] as neither Plaintiffs nor Dr. Madden produced any of them.   Dr. Malik never discussed Castillo or his treatment of Castillo with Dr. Madden or Dr. Malik's office manager, Isis Diaz.[18]   Dr. Madden and Ms. Diaz have never met Castillo and do not know who he is.[19]   Of course, none of the foregoing

---

[13] Ex. B, Diaz Dep., at 32:16-33:2; Exhibit E, Consultation Note, at 1.
[14] Ex. D, Madden Dep., at 30:8-9; Ex. E, Consultation Note, at 1.
[15] Ex. E, Consultation Note, at 1 (emphases in original).
[16] *Id.*; Exhibit F, Stress Test Printout.
[17] Ex. D, Madden Dep., at 31:8-14.
[18] *Id.* at 22:8-20, 23:9-12; Ex. B, Diaz Dep., at 22:13-18.
[19] *Id.*

information came from Dr. Malik.   Instead, Lancet only received information concerning Castillo from Plaintiffs.

Importantly, although the consultation note is dated January 15, 2015, it was not electronically signed by "Dr. Malik" until June 5, 2015.[20]   However, it is undisputed that Dr. Malik returned to Pakistan in February 2015.[21]   The parties understand that Dr. Malik likely fled the country because on January 5, 2015 he and his medical practices agreed to settle a multi-million dollar False Claims Act case brought by the Department of Justice.[22]

The date discrepancy on the face of the consultation note at least suggests that Dr. Malik never reviewed the note for accuracy and did not actually sign it.   One is left to guess how much input, if any, Dr. Malik actually provided in generating the note.   The note indicates that it was faxed to Plaintiffs' counsel on the same date that it was electronically signed (June 5, 2015).[23] Again, this at least suggests that the person who faxed it to Plaintiffs' counsel – necessarily an individual who did not treat Castillo – signed the note without Dr. Malik's input or consent. Without Dr. Malik, Lancet has no way of investigating these glaring issues.

### D.   Lancet diligently sought to obtain the Insureds' cooperation in the defense of Plaintiffs' medical malpractice action.

On July 2, 2015, Plaintiffs' counsel sent a letter to Lancet advising of Plaintiffs' medical malpractice claims against the Insureds.[24]   This was the first time Lancet was made aware of this claim.   Lancet immediately made efforts to contact the Insureds and appointed defense counsel on their behalf.

---

[20] Ex. E, Consultation Note, at 2.
[21] Exhibit G, Affidavit of Service of Process, ¶ 2; Exhibit N.
[22] Exhibit H, Final Order; Exhibit N.
[23] Ex. E, Consultation Note, at 1, 2.
[24] Exhibit I.

LEGAL\27887376\3

On July 24, 2015, Lancet sent a letter to Dr. Malik at the address stipulated in the Policy declarations[25] as well as to Dr. Malik's last known personal address and to Dr. Malik's known email address.[26]  Therein, Lancet stated (i) it received the July 2, 2015 letter from Plaintiffs, which was the first time it became aware of the alleged occurrence; (ii) it appointed defense counsel on the Insureds' behalf; (iii) it and defense counsel required the Insureds' and Dr. Malik's assistance and cooperation in discussing the allegations in the July 2, 2015 letter; and (iv) its investigation remained ongoing and its defense under the Policy was being provided under a strict reservation of rights.[27]  Lancet did not receive a response to that letter.[28]

On July 24, 2015, Plaintiffs commenced an action against the Insureds (but not Dr. Malik individually), along with other medical providers, in the Circuit Court for Montgomery County, Maryland, which is captioned *Mora et al. v. Ishtiaq Malik, M.D., P.C. et al.*, Case No. 407276-V. On that same date, Plaintiffs' counsel sent Lancet a letter enclosing the complaint and related initial filings.[29]  After receiving that letter, on August 6, 2015 Lancet sent another letter to the Insureds and Dr. Malik.[30]  Therein, Lancet stated: (i) it and defense counsel previously tried to contact the Insureds; (ii) Plaintiffs filed a lawsuit; (iii) the Insureds must immediately assist and cooperate with Lancet to investigate and defend the lawsuit; (iv) in failing to communicate with Lancet, the Insureds were failing to comply with the Policy; and (v) requesting that the Insureds provide specific documents and information by August 21, 2015.[31]  Again, Lancet did not receive a response.[32]

---

[25] The Policy expressly provides that "Notices to the Insured(s) are deemed to have been correctly advised if sent by mail to the Primary Insured at the address stipulated in the Declarations."  *Exhibit A. § 6.*
[26] Exhibit J, at 1.
[27] *Id.* at 2.
[28] Exhibit K, Declaration of Chris Teter ("Teter Decl."), ¶ 3.
[29] Exhibit L.
[30] Exhibit M.
[31] *Id.*
[32] Ex. K, Teter Decl., ¶ 3.

9

Lancet made numerous other efforts to contact the Insureds.   On August 6, 2015, Lancet's counsel contacted Dr. Malik's former counsel in the False Claims Act case, Robert Clark.[33]   Mr. Clark advised that: Dr. Malik moved to Pakistan, did not intend to return to the United States, and was not returning calls or emails as of April 2015.[34]   In August 2015, Lancet's undersigned counsel also called the Assistant State Attorney who prosecuted the False Claims Act case, but did not receive a return call.

After not receiving the requested documents and information by August 21, 2015, on August 27, 2015, Lancet sent another letter to the Insureds and Dr. Malik, repeating its previous points and adding that it was unsure whether they had been served and, if they had, to please immediately contact defense counsel.[35]   Again, no response.[36]   On October 6, 2015, Lancet sent a fourth letter, reiterating its prior points and noting Plaintiffs' counsel had informed it that the Insureds had been served.[37]   Lancet again requested certain documents and information, this time by October 12, 2015, further adding:

> Your continued failure to comply with your obligations under the Policy will result in no coverage being afforded to you, both for defense and indemnity, with respect to the allegations made in the Lawsuit.  If you fail to respond to this letter, Lancet will have no choice but to cease providing you with a defense with respect to the allegations made in the Lawsuit.[38]

Once again, no response.[39]   On October 16, 2015, Lancet sent a fifth letter detailing all of its prior efforts to contact the Insureds and Dr. Malik, and confirming it was denying coverage:

> [A]s explained to you in Lancet's letter dated October 6, 2015, because of your failure to comply with your obligations under the

---

[33] Exhibit N.
[34] *Id.*
[35] Exhibit O.
[36] Ex. K, Teter Decl., ¶ 3.
[37] Exhibit P.
[38] *Id.* at 6 (emphasis removed).
[39] Ex. K, Teter Decl., ¶ 3.

> Policy, no coverage is afforded to you or your entities under the
> Policy, either for defense or indemnity, with respect to the
> allegations made in the Lawsuit. As of the date of this letter,
> Lancet is withdrawing the defense that was being provided to you
> under a strict reservation of rights and Lancet will no longer be
> providing you with a defense with respect to the allegations made
> in the Lawsuit.[40]

The Insureds did not respond to that letter.[41]

On February 1, 2016, Plaintiffs' counsel provided the undersigned counsel with two
potential Pakistan addresses for Dr. Malik.[42]  On February 26, 2016, Lancet sent identical letters
to each of the two Pakistan addresses, restating the same points as before; confirming it
continued to deny coverage but still asking Dr. Malik to immediately contact Lancet; and
enclosing all prior letters sent by Lancet to the Insureds and Dr. Malik.[43]  Again, no response.[44]

### E.    Procedural history

On March 2, 2016, Plaintiffs filed this declaratory judgment action directly against
Lancet in the Circuit Court for Montgomery County, Maryland.[45]  Lancet timely removed the
case to this Court and filed a counterclaim seeking a declaration that Lancet does not owe
coverage to the Insureds for Plaintiffs' claims and that the Policy is void for lack of cooperation.
On August 22, 2016, Plaintiffs filed a summary judgment motion.  The Insureds now cross move
for summary judgment and respond to Plaintiffs' motion.

## II.    LEGAL ARGUMENT

### A.    Standard of review on a summary judgment motion

"Summary judgment is proper where there is no genuine issue of material fact and the
moving party proves that it is entitled to judgment as a matter of law." *Penn-Am. Ins. Co. v.*

---

[40] Exhibit Q, at 5 (emphasis removed).
[41] Ex. K, Teter Decl., ¶ 3.
[42] Exhibit R.
[43] Exhibit S.
[44] Ex. K, Teter Decl., ¶ 3.
[45] Plaintiffs also sued another doctor who treated Castillo, but they have since settled.

*Lewis*, 395 F. Supp. 2d 250, 253 (D. Md. 2005); Fed. R. Civ. Pro. 56(c).  "In the context of a suit for declaratory judgment resolving insurance coverage, summary judgment in favor of the insurer is proper where there are no material facts in dispute which would lead to a potentiality for coverage." *Lewis*, 395 F. Supp. 2d at 253.

  **B.**  **Interpretation of insurance policies under Maryland law**

  In construing contracts of insurance, Maryland follows the general contract rule that the agreement should be viewed as a whole to determine the intention of the parties to the contract and the purpose which they sought to accomplish.  *St. Paul Fire & Marine Ins. Co. v. Nationwide Mut. Ins. Co.*, 79 Md. App. 734, 737-38, 558 A.2d 1244 (1989).  When the provisions are not ambiguous, a court should enforce them according to their plain meaning.  *Id*. Insurance policy provisions must be read in context and *in pari materia* with other policy provisions.  *See O'Quinn v. Md. Auto. Ins. Fund*, 157 Md. App. 214, 850 A.2d 386 (Md. App. 2004); *Allstate Ins. Co. v. Sparks*, 63 Md. App. 738, 743 493 A.2d 1110, 1112 (1985) (holding that an intended damages exclusion was *in pari materia* with language in the policy defining an "occurrence" under the policy as an "accident.").

  **C.**  **The Court should declare that the Policy does not provide coverage because the Insureds' failure to cooperate prejudiced Lancet.**

  The Insureds undisputedly failed to cooperate.  Despite diligently seeking it out, Lancet has received no contact, no information, and no involvement whatsoever from its Insureds.  In order to rely upon the Policy's detailed cooperation requirements, Lancet must show that the Insureds' lack of cooperation caused it prejudice.  It easily does so because, without Dr. Malik's account of what occurred during the medical visit, Lancet had absolutely no way of factually investigating and subsequently defending Plaintiffs' claims. Because Lancet was and remains incurably prejudiced, no coverage is afforded under the Policy for Plaintiffs' claims and the Policy is rendered void for lack of cooperation.

1. **Plaintiffs concede that the Insureds utterly failed to cooperate in the defense of the medical malpractice action.**

The Policy obligates the Insureds to cooperate with Lancet in defending the malpractice action.[46]  That obligation requires the Insureds to (i) provide sufficient information to Lancet to enable Lancet to determine all available defenses and (ii) assist with asserting those defenses.

> Generally, an insured's duty to cooperate "include[s] the obligation to make a fair, frank and truthful disclosure to the insurer for the purpose of enabling it to determine whether or not there is a defense, and the obligation, in good faith, both to aid in making every legitimate defense to the claimed liability and to render assistance at trial."

*Woznicki v. GEICO Gen. Ins. Co.*, 216 Md. App. 712, 732 (2014).

Lancet sought the Insureds' cooperation through multiple letters, e-mails and phone calls. It sent six separate letters to the Insureds and Dr. Malik (including at both his Maryland addresses, Pakistan addresses and e-mail address) over a seven-month period from July 24, 2015 through February 26, 2016.[47]  Lancet, Lancet's attorneys, and the Insureds' appointed attorney each attempted contact with the Insureds but without any success.[48]  Lancet's counsel also contacted both Dr. Malik's attorney and the prosecutor in the False Claims Act case in an effort to locate the Insureds.[49]  But the Insureds never responded to Lancet's communications or otherwise contacted Lancet.[50]  Plaintiffs concede the Insureds failed to cooperate with Lancet.[51] Given that Dr. Malik moved to Pakistan over 18 months ago, it is clear that Lancet will never secure the Insureds' cooperation.

2. **The Insureds' non-cooperation prejudices Lancet.**

---

[46] Ex. A, Policy, Inclusive Policy, at 3, § 2, 21, § 25.
[47] Exs. J, M, P, Q, R, T.
[48] Ex. K, Teter Decl., ¶ 3.  Ex. N.
[49] Ex. N.
[50] Ex. K, Teter Decl., ¶ 3.
[51] Plaintiffs' Memo., at 19.

13

**a.     To establish actual prejudice, Lancet need only show that the Insureds' non-cooperation precludes or hampers Lancet from presenting a credible defense.**

To succeed on its non-cooperation defense, Lancet must demonstrate that the Insureds' failure to cooperate has prejudiced Lancet's ability to defend the claim.  The Policy provides in pertinent part:

> *Any failure of the Insured to cooperate that prejudices our ability to defend any Claim, shall void this Policy, nullify coverage and will disqualify the Insured from being eligible to exercise the option to purchase an Extended Reporting Period endorsement.*[52]

To demonstrate prejudice under Maryland law, Lancet must show that the Insureds' failure to cooperate restricted its ability to offer a "credible defense":

> [T]he proper focus should be on whether the insured's willful conduct has, or may reasonably have, precluded the insurer from establishing a legitimate jury issue of the insured's liability, either liability *vel non* or for the damages awarded. … [That] require[s] … that the insurer show that the failure of cooperation has, in a significant way, precluded or hampered it from presenting a credible defense.

*Allstate Ins. Co. v. State Farm. Mut. Auto. Ins. Co.*, 363 Md. 106, 127-28 (2001).

A review of the facts of the *Allstate* decision, and the policy language at issue in that case, provides clarity and context to the issues in this matter.  The *Allstate* decision involved the breach of a standard cooperation provision in an automobile policy issued by State Farm to its insured, Latricia Kirby ("Kirby").  *Id*. at 108.  The applicable cooperation provision provided that Kirby must, among other things "cooperate with us and, when asked, assist us in: a. making settlements; b. securing and giving evidence; [and] c. attending and getting witnesses to attend hearings and trials."  *Id*.  Kirby was involved in an automobile accident involving a number of other drivers.  *Id*.  Kirby reported the accident to her carrier, provided initial cooperation in the form of a witness statement, discovery responses, and extensively participated in the subsequent

---

[52] Exhibit A, § 25.

litigation for months.  *Id*. at 109-111.  Two years after the accident and during the litigation, Kirby was married and moved to Georgia.  *Id*. at 111.  She ceased cooperating with State Farm at that time, refused to attend her deposition and failed to attend trial.  *Id*.  Ultimately, judgment was entered against Kirby after an empty chair trial.  *Id*.

After Kirby moved and ceased cooperating, the carrier asserted a lack of cooperation defense and ultimately the trial court and two appellate courts wrestled with the appropriate prejudice standard.  The above described "ability to present a credible defense" standard was adopted and applied by the *Allstate* court.  *Id*. at 127-128.  In applying this standard, the court found that Kirby's eventual lack of cooperation, in the form of a refusal to attend her deposition and trial, was "unquestionably" actual prejudice to the insurer.  *Id*. at 128.

A comparison of the *Allstate* facts to the facts at hand demonstrates that Lancet has unquestionably suffered incurable prejudice in this matter.  First, the lack of cooperation here was of the most extreme variety.  This is not a failure to attend trial case.  It is a failure to do anything case.  It is undisputed that despite considerable effort, Lancet has had no contact whatsoever with its Insureds.  Second, Lancet has had no opportunity to even learn the facts from the standpoint of Dr. Malik, who is undisputedly the only surviving witness to Castillo's visit.  In *Allstate*, the carrier at least had the opportunity to learn the facts and evidence and work with their insured for two years before the lack of cooperation began.

Finally, this is not an automobile coverage case subject to a couple lines of standard ISO[53] cooperation language.  This is a medical professional liability coverage case subject to detailed, manuscript cooperation language drafted by physicians specifically for the defense of physicians.  As Dr. Malik's standard of care is the issue in the underlying matter, his testimony

---

[53] The Insurance Services Office (ISO) is an organization that develops standard policy forms, collects statistical data, promulgates rating information, and files information with state regulators on behalf of insurance companies that purchase its services.  *See* https://www.irmi.com/online/insurance-glossary/terms/i/insurance-services-office-inc.-iso.aspx

would have been the most important evidence in the case.   Without him, Lancet was unquestionably prevented from presenting a credible defense of its Insureds.

Because Lancet easily meets the standard announced in *Allstate*, Plaintiffs urge the Court to ignore *Allstate* and apply a different standard.  *Allstate* explains a "legitimate jury issue" exists where an insured's non-cooperation does not hinder an insurer's ability to present a "credible defense."  *Id.*   And yet, Plaintiffs ask the Court to look elsewhere for a definition of a "legitimate jury issue," directing it to Maryland's directed-verdict standard.[54]   Not only is that standard irrelevant because *Allstate* already defines a "legitimate jury issue," but it also makes little sense in this context.  The directed-verdict standard asks whether evidence presented at trial permits a case to go to the jury.  Here, the proper focus is not the sufficiency of the existing evidence but rather how the *lack* of critical information hampers Lancet's ability to present a credible defense.  *Allstate*, 363 Md. At 127.

Plaintiffs do not stop there in seeking to avoid the *Allstate* standard that dooms their case.  They also contend that no prejudice exists where, even if an insured had cooperated, its conduct would remain "indefensible."[55]   But in adopting the "legitimate jury issue" standard from a Virginia case, *Allstate* specifically rejected the aspect of the Virginia standard that considers whether an insured's cooperation would have rendered the case defensible:

> [W]e do not concur entirely with the *Davies* standard as articulated by the Virginia court, in that we do not agree that establishment of a "jury issue of the insured's liability" necessarily equates to the establishment of "a reasonable likelihood the result would have been favorable to the insured."

363 Md. at 127.  Federal courts have likewise rejected the "indefensible" argument:

> The Johnstons further object that MPC could not have been substantially prejudiced by Dr. Bubenik's failure to cooperate because the Johnston case was indefensible. This argument rests on

---

[54] Plaintiffs' Memo., at 20.
[55] Plaintiffs' Memo., at 22.

> a misunderstanding of the applicable legal standard, however, for
> MPC does not need to show that it would have won the case with
> Dr. Bubenik's cooperation. Rather, it must "prove how [Dr.
> Bubenik's noncooperation] actually was prejudicial."

*Med. Protective Co. v. Bubenik*, 594 F.3d 1047, 1053 (8th Cir. 2010); *see also Med. Protective*

*Co. v. Ctr. for Advanced Spine Techs.*, No. 1:14-cv-5, 2015 U.S. Dist. LEXIS 102577, at \*25

(S.D. Ohio Aug. 5, 2015) ("The relevant inquiry is not whether a case is indefensible, even if the

insured had cooperated.  Instead, prejudice involves a 'material injury to the insurer's ability to

contest the merits of the case, or serious impairment in investigating the claim or defending the

merits of the case'" (citations omitted)).   What matters is whether Lancet has been precluded

from asserting a credible defense as a result of Dr. Malik's failure to cooperate, not whether that

defense would have succeeded.

In any event, Plaintiffs' "indefensible" argument does not hold up.  To dispute a medical

malpractice claim, a defendant must file a certificate of qualified expert.  Lancet did not file that

certificate for the Insureds because, after they failed to cooperate and Lancet's diligent efforts to

elicit that cooperation came up empty, Lancet declined to defend them. Plaintiffs argue that,

because Lancet failed to file a certificate stating the case was defensible, the case necessarily is

not.[56]  Plaintiff's logic does not follow and would place medical professional liability insurers in

a Catch 22.   One cannot draw conclusions from Lancet's inability to assert a credible defense

considering that it cannot even assess any credible defenses without the Insureds' cooperation

and involvement.

> **b.      Medical professional liability claims are uniquely reliant upon the cooperation of the medical professional.**

In a medical malpractice case, the treating doctor is the single most important witness.

That is why courts routinely find that, where a doctor refuses to cooperate in his or her defense,

the insurer sustains prejudice. *See, e.g.*, *Med. Assurance Co. v. Miller*, 779 F. Supp. 2d 902, 920

---

[56] Plaintiffs' Memo., at 23.

(N.D. Ind. 2011) ("[T]he Knights were required to prove that Miller committed medical malpractice and that that malpractice was the proximate cause of their injuries. Those determinations centered around Miller's conduct, which could not be determined without his testimony."); *Med. Protective Co. v. Bubenik*, No. 06-1639, 2008 WL 5070042, at *29-31 (E.D. Mo. 2008), *aff'd*, 594 F.3d 1047 (8th Cir. 2010) ("[Certain] items were pieces of information that Dr. Bubenik possessed and that he alone was capable of giving testimony."). In *Miller* the court recognized that the carrier entirely "lost the ability to litigate" the medical malpractice action due to the disappearance of the insured treating physician. *Miller*, 779 F. Supp. 2d at 920. Similarly, in *Bubenik*, the court recognized that the "[treating physician's] testimony was, in fact, highly important to the defense of the medical malpractice claim filed against him." *Bubenik*, No. 06-1639, 2008 WL 5070042, at *27.

Plaintiffs contend the Insureds acted negligently because, during Castillo's first and only visit to Dr. Malik on January 15, 2015, Dr. Malik allegedly failed to advise him to go to the emergency room ("ER") or undergo a cardiac catheterization. According to Plaintiffs' theory then, the Insureds' potential liability thus depends exclusively on what transpired during that visit. It is undisputed that there are no witnesses with relevant knowledge other than Dr. Malik. There is an absence of evidence suggesting Castillo met with anyone other than him. Nor do any witnesses have secondhand knowledge because Dr. Madden (the only other doctor at the Insureds) and Ms. Diaz never discussed Castillo with Dr. Malik.[57] All we have is a brief consultation note that, as previously demonstrated, may not have been prepared or signed by Dr. Malik.[58] It is undisputed that Dr. Malik is the sole witness with any knowledge about what happened on January 15, 2015.

---

[57] Ex. B, Diaz Dep., at 22:13-18; Ex. D, Madden Dep., at 22:8-20, 23:9-12.
[58] Ex. E, Consultation Note.

Speaking with Dr. Malik is the only way for Lancet to assess whether a credible defense exists. The following are but a few of the litany of questions Dr. Malik would need to answer so Lancet can make that assessment:

1. What information, including information relating to his chest pains, did Castillo give you aside from what is contained in your consultation note?

2. Did Castillo tell you his chest pain had existed for months?

3. How long do you normally allow a patient to undergo a cardiovascular stress test before advising them to stop?

4. Did Castillo tell you he previously underwent a stress test and its result?

5. Did you create a report from or otherwise interpret Castillo's stress test printout?

6. Did Castillo stop the stress test on his own or did you tell him to stop?

7. Why did Castillo stop the stress test on his own or why did you tell him to stop?

8. Did Castillo stop the stress test at exactly the three-minute mark? If not, exactly how long did he undergo the stress test?

9. Given Castillo stopped the stress test after about three minutes, did you consider telling him to go to the ER or undergo a cardiac catheterization?

10. Identify all the factors you typically consider when determining whether to tell a patient to go to the ER or undergo a cardiac catheterization.

11. Identify all the factors you considered when determining whether to tell Castillo to go to the ER or undergo a cardiac catheterization, and explain how each factor affected your decision.

12. Did you tell Castillo to go to the ER or undergo a cardiac catheterization? If so, (i) describe in detail what you said to him; (ii) how soon did you tell him to do so?; and (iii) what did he say in response?

13. If you did not tell Castillo to go to the ER or undergo a cardiac catheterization, why did you not do so?

14. When you tell a patient to go to the ER or undergo a cardiac catheterization, do you always include that instruction in your consultation note?

19

15. Did you say anything to Castillo not contained in your consultation note?

16. Do you always include in your notes everything discussed with your patients?

17. What did Castillo's EKG reveal?

18. Do you have a copy of the EKG printout?

19. Did you generate a report from or otherwise interpret Castillo's EKG printout?

20. Did you dictate Castillo's consultation note? If so, did you subsequently review the note for accuracy?

21. Did you electronically sign Castillo's consultation note and, if not, did you authorize someone to electronically sign it on your behalf?

22. Have you spoken with anyone about Castillo or your treatment of him? If so, what did you discuss with them?

23. Did you decide to return to Pakistan before you met with Castillo?

24. Why did you return to Pakistan?

25. When and how did you learn of Castillo's death?

Based upon the undisputed evidence in this case, none of that necessary information is available from any source other than Dr. Malik.

Plaintiffs know Dr. Malik's absence gravely prejudices Lancet. Rather than address that unavoidable elephant in the room, Plaintiffs seek to distract the Court by arguing the existing evidence somehow cures the prejudice caused by Dr. Malik's absence.[59] However, Plaintiffs' evidence does not come close to being an adequate substitute for Dr. Malik. It is furthermore mostly irrelevant or otherwise useless:

> • **Consultation note and stress test printout:** Lancet's cardiologist expert found the note to be "completely inadequate" because it "provides little or no information" and the stress test printout to be useless because "[t]here are no physician

---

[59] Plaintiffs' Memo., at 19-21.

observations" and "[i]nterpretively, the printouts are worthless with no readable tracings. As a result no interpretation can be drawn from the stress test."[60] Moreover, the two documents do not answer any of the 25 above questions; all they do is show the stress test was stopped at the approximate three-minute mark and Dr. Malik did not document whether he told Castillo to go to the ER or undergo a cardiac catheterization.  Critically, Lancet has no way of confirming that the consultation note is accurate based upon the date of Dr. Malik's signature.

• **Autopsy report:** This report obviously did not exist at the time of the January 15, 2015 visit and therefore was not available to Dr. Malik, such that its content is irrelevant to whether Dr. Malik acted negligently during the visit.

• **Castillo's prior medical records:** No evidence exists suggesting Castillo brought any past medical records to Dr. Malik's walk in clinic.  Because Dr. Malik did not review these records before seeing Castillo, they are irrelevant.

• **Dr. Madden and Ms. Diaz:** Based upon their own sworn testimony, neither of these witnesses knows anything about Castillo or Dr. Malik's treatment of him.[61] On a related note, it is disingenuous for Plaintiffs to fault Lancet for not having spoken with Dr. Madden or Ms. Diaz when it is Plaintiffs' attorney who elicited the deposition testimony from them that they know nothing about Castillo.  Furthermore all communications in this case were sent to the location of Dr. Madden's existing practice, with no response.[62]

• **The opportunity to depose Plaintiffs' experts:** Questioning Plaintiffs' experts and potentially undermining Plaintiffs' theory of liability does not obviate the prejudice Lancet sustains in being unable to consult with Dr. Malik.

Try as Plaintiffs might to suggest Lancet has evidence upon which it can create a "credible defense," without the Insureds' assistance and cooperation, it is simply not true.

Plaintiffs' case thus comes down to the unverified consultation note alone, with this argument: (i) Castillo had to stop the stress test after three minutes; and (ii) because the note does

---

[60] Exhibit T, Expert Report of Richard A. Schwartz ("Schwartz Report") dated July 21, 2016, at 1.
[61] Ex. B, Diaz Dep., at 22:13-18; Ex. D, Madden Dep., at 22:8-20, 23:9-12.
[62] Ex. D, Madden Dep., at 6:6-10.

not state Dr. Malik told Castillo to go to the ER or get a cardiac catheterization, Dr. Malik

necessarily did not do so.   Lancet cannot effectively rebut Plaintiffs' inferences from those

documents without asking Dr. Malik what occurred during the visit, why he did or did not take

certain actions, what discussions were undocumented, or even if the consultation note is even

accurate.   If Dr. Malik told Castillo to go to the ER or get a catheterization, no one will ever

know.   If Dr. Malik did not so instruct Castillo, he may have had very legitimate reasons for

doing so but no one will ever know what they are.[63]   Without Dr. Malik, this becomes a highly

speculative case based on a single medical record that generates more questions than answers.

And that is precisely why Lancet's cardiologist expert found that, without Dr. Malik, it is

impossible to determine if the Insureds have a credible defense:

> The results of my findings is that no conclusion can be made
> regarding the standard of care provided to Mr. Castillo. There is
> simply not enough information from which to draw any opinion
> whatsoever. Further, as an expert, it is my expectation to be able to
> interact and question the treating physician, as well as having the
> entire medical record to review. Absent these opportunities, no
> valid conclusions can be drawn.[64]

Plaintiffs are simply wrong that Lancet could have provided a credible defense to

Plaintiffs' claims.   With just a short medical note and unreadable stress test printout,

unaccompanied by Dr. Malik's corresponding explanation, no physician would risk their

reputation by signing the requisite certificate of qualified expert or offering testimony that Dr.

Malik complied with the duty of care.   The lack of that certificate would have ended the case at

the outset.

Nor could appointed defense counsel have completed even the most basic litigation

functions: answering the complaint, providing interrogatory responses, or producing Dr. Malik

for deposition.   A failure in any of these areas are of course violations of fundamental rules of

---

[63] Exhibit U, Expert Report of William E. Artz ("Artz Report") dated July 21, 2016, at 4.
[64] Ex. T, Schwartz Report, at 1.

civil procedure and would have almost certainly resulted in severe discovery or other sanctions, even perhaps a default judgment.[65]   Further, Dr. Malik's empty trial chair would have looked horrible to a jury.[66]   Although Plaintiffs assert that Lancet "invited" the $2.56 million default judgment entered against the Insureds by refusing to defend them[67], for the above reasons Lancet's attempts to defend the Insureds without Dr. Malik would have been unquestionably futile.

Furthermore, pursuant to the plain language of the Policy purchased by Dr. Malik, Lancet does not contractually have to defend him in these circumstances.   The Policy's clear provisions, taken *in pari materia*, expressly require contact from, and the direct involvement of, the medical professional insured.[68]   *See St. Paul Fire & Marine Ins. Co. v. Nationwide Mut. Ins. Co.*, 79 Md. App. 734, 737-38, 558 A.2d 1244 (1989); *O'Quinn v. Md. Auto. Ins. Fund*, 157 Md. App. 214, 850 A.2d 386 (Md. App. 2004); *Allstate Ins. Co. v. Sparks*, 63 Md. App. 738, 743 493 A.2d 1110, 1112 (1985).

This is the most extreme case possible of an insured's failure to cooperate.   This is not a case where the insured was not helpful in a claim investigation.   This is not a case where an insured refused to attend a deposition, or refused to attend trial in a run of the mill automobile case.   This is a case involving a medical professional liability claim where, despite diligently seeking it out, Lancet received no contact, assistance, or cooperation whatsoever from its insured.   This is a case where Lancet was entirely deprived of access to its insured medical professional, who also happens to be the only person with any knowledge about what happened on January 15, 2015.   If these circumstances do not present incurable prejudice and an inability to present a credible defense under Maryland law, then what circumstances do?

---

[65] Ex. U, Artz Report, at 4.
[66] *Id.*
[67] Plaintiffs' Memo., at 23.
[68] Ex. A, Policy, § 2, § 6, § 21, § 25.

**D.     The Insureds' failure to provide notice of Plaintiffs' claim to Lancet, by itself, eliminates coverage under the Policy.**

The record is clear that the Insureds never provided notice of Plaintiffs' claims to Lancet. This failure, alone, eliminates coverage for Plaintiffs' claims under the Policy. That necessary act triggering coverage under the Policy has simply not occurred. Plaintiffs' reliance upon Md. Code, Ins., § 19-110 as requiring Lancet to establish actual prejudice from the Insured's lack of notice is misplaced. Section 19-110 is preempted by federal law. Additionally, even if not preempted, Section 19-110 is not applicable to the Insureds' claims-made and reported Policy. Finally, even if Section 19-110 does apply, Lancet has already amply demonstrated the incurable prejudice it suffered from the Insureds' failure to provide notice of Plaintiffs' claims to Lancet.

**1.     Federal Law Preempts Maryland Code Section 19-110.**

As an RRG, Lancet is regulated pursuant to federal law under the LRRA. Importantly, with the exception of the RRG's domiciliary state (Nevada for Lancet), the LRRA preempts nearly all state insurance law applicable to traditional insurance companies. *See* 15 U.S.C. § 3902(a).

Courts across the country have recognized the LRRA's sweeping preemption of a non-domiciliary state's regulation of RRGs. *See, e.g.*, *Wadsworth v. Allied Professionals Insurance Company*, 748 F.3d 100, 101 (2d Cir. 2014) (explaining that the LRRA "contains sweeping preemption language that sharply limits the authority of states to regulate, directly or indirectly, the operation of risk retention groups chartered in another state," further holding that the LRRA preempted New York's direct action statute); *Speece v. Allied Professionals Insurance Company*, 853 N.W.2d 169, 181 (Neb. 2014) (holding that state statute barring arbitration provisions did not apply to risk retention groups and was preempted by the LRRA, further explaining "the LRRA does preempt the application of this Nebraska statute to foreign risk retention groups, and

that as a result, the arbitration clause in the policy APIC issued to Speece was not prohibited by [Nebraska state insurance law].”); *Courville v. Allied Professionals Ins. Co.*, 2013-0976 (La. App. 1 Cir. June 5, 2015), 174 So. 3d 659, 673, *writ denied*, 2015-1309 (La. October 30, 2015), 179 So. 3d 615 (holding the LRRA preempted Louisiana’s direct action statute, explaining that state statute was “inapplicable to risk retention groups chartered in another state”).

The court in *Wadsworth* provided the following succinct analysis concerning the LRRA’s preemption of state insurance law:

> Even given the general presumption, specifically reinforced by the McCarran–Ferguson Act, that insurance regulation is generally left to the states, the language and purpose of the LRRA clearly announce Congress’s explicit intention to preempt state laws regulating risk, retention groups.
>
> * * *
>
> Plainly, §§ 3902(a)(2) and (3) are not directed toward placing risk retention groups “on equal footing” with traditional insurers. To the contrary, both of those provisions excuse risk retention groups from certain requirements that states may and typically do impose upon insurers licensed within that state. Moreover, § 3902(a)(4) expressly prohibits discrimination against risk retention groups. . . . Congress specifically preempted “*any*” law, rule, or regulation by a nondomiciliary state that would “regulate, directly or indirectly, the operation of a risk retention group.” 15 U.S.C. § 3902(a)(1) (emphasis added). A clearer prohibition would be hard to devise. . .
>
> For these reasons, we have read the LRRA’s preemption language broadly.  In enacting the LRRA, we have held, Congress desired “to decrease insurance rates and increase the availability of coverage by promoting greater competition within the insurance industry.” *Preferred Physicians*, 85 F.3d at 914, citing H.R.Rep. No. 99–865, 1986 U.S.C.C.A.N. 5303, 5304–06.  “[T]he legislative history of the Act makes clear that Congress intended to exempt [risk retention groups] broadly from state law ‘requirements that make it difficult for risk retention groups to form or to operate on a multi-state basis.’” *Id.* at 915–16, citing 1986 U.S.C.C.A.N. 5303, 5305.  An expansive reading of the preemption language furthers the Act’s purpose. *Id.* at 915.

25

*Wadsworth*, 748 F.3d at 105–07 (footnotes omitted).

Plaintiffs cite to Md. Code, Ins., § 19-110, arguing that Lancet must establish actual prejudice stemming from the Insured's complete lack of notice for Plaintiffs' claim. Putting aside the plethora of evidence demonstrating the prejudice suffered by Lancet regarding this claim, based upon the express language of the LRRA and the courts across the country interpreting the sweeping preemption of this area of federal law, this Court should determine that the LRRA preempts Md. Code, Ins., § 19-110, and is thus inapplicable to Lancet.

### 2. Even if not Preempted, Section 19-110 Does Not Apply to the Insureds' Claims-Made and Reported Policy.

Even if Section 19-110 is not preempted by the LRRA, it still does not apply to the Insureds' claims-made and reported Policy. In an attempt to argue against this proposition, Plaintiffs improperly rely upon *Sherwood Brands, Inc. v. Great Am. Ins. Co.*, 13 A.3d 1268 (Md. 2011).

In *Sherwood*, after the insured was sued for wrongful termination by one of its employees, it did not provide timely notice of the suit to its liability insurer within the time provided by the policy. *Sherwood*, 13 A.3d at 1271-72. Following the insurer's denial of the claim as being untimely, the insured sued its carrier for breach of contract. *Id.* at 1272-73. The insurer moved for summary judgment and the insured opposed, arguing that the insurer failed to demonstrate actual prejudice for the late-notice of the underlying lawsuit, as required by Md. Code, Ins., § 19-110. *Sherwood*, 13 A.3d at 1273. The trial court granted summary judgment in favor of the insurer, determining that Section 19-110 did not apply to the policy at issue, which the court found to be a "claims made with reporting period" policy. *Id.* at 1273-74. The Court of Appeals of Maryland reversed, and held that Section 19-110 applied to the policy at issue. *Id.* at

1270, 1288-89.  Both the trial court and the appellate court focused on the specific type of policy at issue to determine whether Section 19-110 applied.

The language of the insuring agreement clearly shows that the policy in *Sherwood* was not a claims-made and reported policy a claims made policy, and was rather a claims made policy:  "The Insurer shall pay on behalf of the Insured Persons all Loss which the Insured Persons shall be legally obligated to pay as a result of a Claim . . . <u>first made</u> against the Insured Persons during the Policy Period . . ." *Sherwood*, 13 A.3d at 1270 (emphasis added).  There was no reporting requirement in the insuring agreement in *Sherwood*; thus, coverage under the *Sherwood* policy is triggered merely through a claim being made against the insured.

In contrast, the Insureds' Policy with Lancet is a claims-made and reported policy.  The insuring agreement provides as follows:

> The coverage provided under this Policy is limited to liability for Claims <u>first made</u> against the Insured for Bodily Injury arising from an Occurrence happening subsequent to the Retroactive Date stated in the Declarations and which are <u>first made</u> against the Insured during the Policy Period <u>and reported</u> to Lancet Indemnity Risk Retention Group, Inc. (the "Company") during the Policy Period.[69]

In clarifying Maryland law with respect to the difference between a "pure" claims-made policy and a "reporting-type" policy (like the Lancet claims-made and reported Policy), the Court in *Sherwood* explained as follows:

> First: In a "pure" claims-made policy, a claim is "made" when a claim (typically a lawsuit) is brought against the insured during the policy period.  Second: In a "reporting-type" claims-made policy, a claim is "made" when, in addition to a claim being brought against the insured during the policy period, the insured reports or notifies the insurer of the claim made against the insured.

---

[69] Ex. A, Policy, General Terms, Conditions and Exclusions (emphasis added).

*Sherwood*, 13 A.3d at 1279.   With this back drop, the court in *Sherwood* ultimately held that Section 19-110 does not apply where "the act triggering coverage" – i.e., a claim being made, or a claim being made and reported, depending upon the specific type of policy involved – does not occur during the policy period.   *Sherwood*, 13 A.3d at 1288.   In other words, without coverage being triggered by the terms of the policy, there can be no breach, and thus Section 19-110 would not apply.

In *Sherwood*, the statute applied because the act triggering coverage for the claims made policy involved (i.e., the underlying lawsuit being filed), occurred within the policy period. Thus, the court held that the insurer was essentially arguing that the policy was breached through the late notice.

In this case, the act triggering coverage for the Insured's claims-made and reported Policy, namely notice and report of claim from the insured, has undisputedly never occurred.   As the *Sherwood* court clarified, "[i]n a 'reporting-type' claims-made policy [like the Insureds' Policy], a claim is 'made' when, in addition to a claim being brought against the insured during the policy period, <u>the insured reports or notifies the insurer of the claim made against the insured</u>." *Sherwood*, 13 A.3d at 1279 (emphasis added).   The record plainly shows that Lancet never received the required notice from the Insureds.   Lancet never received any form of communication from the Insureds.

The clarification from *Sherwood*, as well as the express language from the Policy, establish that the Insured must report any claim to Lancet in order to trigger coverage under the Policy.   Unlike the late notice received from the insured relating to the claims-made policy involved in *Sherwood*, Lancet received no notice from the Insureds, an act plainly required to even trigger coverage under the Insured's claims-made and reported Policy.   Also, unlike

*Sherwood*, this case was not brought by the insured seeking coverage simply after providing late notice. Rather, this case is brought by Plaintiffs, with all information known to Lancet regarding Plaintiffs' claims coming only from Plaintiffs. The Insureds have provided absolutely nothing to Lancet concerning Plaintiffs' claims.

Therefore, *Sherwood* does nothing to support Plaintiffs' position that Section 19-110 would apply to this case. Instead, the court's reasoning actually demonstrates that Section 19-110 does not apply to the Insureds' claims-made and reported Policy. Accordingly, even if Section 19-110 is not preempted by the LRRA, it still does not apply to the Insureds' claims-made and reported Policy.[70] The Insureds' failure to give any notice of Plaintiffs' claims to Lancet, by itself, eliminates any obligation of Lancet to provide coverage for Plaintiffs' claims under the Policy.

> **3.    Even if not preempted, and even if Section 19-110 applies, Lancet has demonstrated the actual prejudice it suffered as a result of the Insureds' failure to provide notice of Plaintiffs' claim to Lancet.**

Ultimately, even assuming Section 19-110 applied to this dispute, Lancet has already demonstrated the incurable prejudice it suffered from the Insured's failure to provide notice of Plaintiffs' claims. The Policy requires the Insured to provide specific details to Lancet when reporting a claim, including a "general description of the circumstances of the occurrence."[71] Among other things, the detailed information from the Insured is necessary to provide Lancet with their insured medical professional's version of the underlying incident forming the basis of the claim.

---

[70] Other courts decided after *Sherwood* have held that § 19-110 does not apply to claims-made and reported policies like the Insured's Policy. *See Minnesota Lawyers Mut. Ins. Co. v. Baylor & Jackson, PLLC*, 852 F. Supp. 2d 647, 659-663 (D. Md. 2012), *aff'd*, 531 F. App'x 312 (4th Cir. 2013); *Fin. Indus. Regulatory Auth., Inc. v. Axis Ins. Co.*, 951 F. Supp. 2d 826, 835-38 (D. Md. 2013).

[71] Ex. A, Policy, Inclusive Policy, at 8, § 6.

Similar to the cooperation and assistance provisions, the notice and reporting provision of the Policy requires that the Insured provide information only known and able to be received from the Insured.  Thus, although Plaintiffs informed Lancet of their malpractice claims, they did not and cannot identify the Insureds' version of the January 15, 2015 visit.  For the reasons explained in Section II.C *supra*, absent that information, Lancet cannot determine whether the Insureds have a credible defense and is thus also prejudiced from the Insured's failure to provide notice.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, Lancet respectfully requests that the Court enter an Order declaring that Lancet does not owe coverage to the Insureds for Plaintiffs' claims and that the Policy is void for lack of cooperation.

COZEN O'CONNOR, P.C.


    /s/   Chad E. Kurtz
Chad E. Kurtz (Bar No. 14102)
1200 19th Street NW, Suite 300
Washington, DC 20036
Tel: (202) 463-2521
Email:  ckurtz@cozen.com

John David Dickenson (*admitted pro hac vice*)
Matthew B. Criscuolo (*admitted pro hac vice*)
One North Clematis Street, Suite 510
West Palm Beach, FL 33401
Tel: (561) 515-5250
Email:  jdickenson@cozen.com
Email:  mcriscuolo@cozen.com

*Attorneys for Defendant/Counterclaim Plaintiff,*
Dated: September 9, 2016          *Lancet Indemnity Risk Retention Group, Inc.*

LEGAL\27887376\3