### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
*Southern Division*

| | | |
|---|---|---|
| CLAUDIA M. MORA, *et al.* | ) | |
| | ) | |
| Plaintiffs/counter-defendants | ) | |
| | ) | |
| v. | ) | Case No. 8:16-cv-0960 PX |
| | ) | |
| LANCET INDEMNITY RISK | ) | |
| RETENTION GROUP, INC. | ) | |
| | ) | |
| Defendant/counter-plaintiff | ) | |

---

**PLAINTIFFS' OPPOSITION TO LANCET INDEMNITY RISK RETENTION GROUP, INC.'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO LANCET'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs/counter-defendants Claudia Mora, Juan C. Castillo, and the minor plaintiffs, through undersigned counsel, hereby oppose Lancet Indemnity Risk Retention Group, Inc.'s (hereinafter "Lancet") Cross-Motion for Summary Judgment and reply to Lancet's Opposition to Plaintiffs' Motion for Summary Judgment.

Lancet must demonstrate that it was precluded from establishing a legitimate jury issue on behalf of its Insureds. Having attempted no defense whatsoever, Lancet cannot possibly do so. What would have happened if Lancet had retained experts and litigated the claim? Lancet cannot say and therefore its claim of prejudice is pure speculation. Just as an insurer cannot claim prejudice regarding its ability to conduct an investigation that it never tried to conduct, General Accident Insurance Co. v. Scott, 107 Md. App. 603, 617, 669 A.2d 773 (Md. App. 1994), so too Lancet cannot establish that it was precluded from establishing a legitimate jury issue that it made no effort to present.

## I. **THE AUGUST 11, 2016 JUDGMENT IS NOW FINAL**

On August 16, 2016, the Circuit Court for Montgomery County docketed the $2.56 million judgment entered by Judge Rubin against Advanced Walk-In Urgent Care, LLC and Union Multi-Care Medical Center, Inc. Judge Rubin's oral decision entering the judgment, including his express finding that the medical practices were negligent, is set forth at Exhibit 36.

Lancet did not file any post-trial motions and did not appeal the judgment within the thirty (30) days allowed by Maryland law. The judgment is now final and hermetically seals the Underlying Case case. All issues regarding negligence, proximate cause and damages have been judicially determined and those findings are the law of the case.

## II. **MD. INSURANCE CODE §19-110 GOVERNS LANCET'S DISCLAIMER**

Plaintiffs and Lancet ask the Court to apply the "actual prejudice" standard enunciated by the Court of Appeals in <u>Allstate v. State Farm</u>, 363 Md. 106, 767 A.2d 831 (2001) but they get there by different routes. Lancet seeks to avoid Md. Ins. Code Ann. §19-110 and argues that the statute does not apply because federal law preempts it and/or because the policy is a claims-made-and-reported form. Both arguments are off-base. Lancet opted to sell a liability insurance policy in Maryland, to Maryland medical practices, insuring a risk located in Maryland, and as a result all roads lead to the application of §19-110.

### A. Preemption

Lancet contends that § 19-110 does not apply to it because it is a Nevada-chartered risk retention group that is preempted from foreign state laws that would regulate its operation based the Liability Risk Retention Act (the "LRRA"), 15 U.S.C. § 3901, *et seq*. Lancet relies on §3902(a)(1) of the LRRA but overlooks §3901(b) which states:

> Nothing in this chapter shall be construed to affect either the tort law **or the law governing the interpretation of insurance contracts of any State** … (emphasis added)

Section 19-110 is a law governing the interpretation of insurance contracts. Its stated subject matter is "liability insurance policies" and it governs the insurer's rights upon a breach of policy terms irrespective of the policy language. The Court of Appeals has applied §19-110 precisely as a tool for interpreting insurance contracts. In Sherwood Brands v. Great American Ins. Co., 418 Md. 300, 13 A.3d 1268 (2011), the Court discussed the policy-interpretive role of §19-110 as follows:

> [Section 19-110] was enacted … to discard the strict condition-precedent approach and "make[ ] policy provisions requiring notice to, and cooperation with, the insurer *covenants* and not *conditions*."(citation omitted)… Therefore, notwithstanding that Great American labeled the notice provisions in the Policy as conditions precedent to coverage, §19-110 mandates that the notice provisions of the Policy be treated as covenants, not conditions.

A statute that tells insurers what the words of their policy shall mean is manifestly a "law governing the interpretation of insurance contracts." Through legislation, Maryland has specified when a liability insurer may disclaim coverage for lack of cooperation or notice. Through §3901(b) of the LRRA, Congress respects each state's right to do so and, accordingly, Maryland §19-110 is incorporated into each liability policy breach of cooperation or notice provision, including those sold by risk retention groups.

### B. Common law

Even if § 19-110 did not apply, this Court should apply the identical prejudice rule as a matter of Maryland common law. In Prince George's County v. Local Government Insurance Trust, 388 Md. 162, 879 A.2d 81, 96-97 (2005), the Court of Appeals adopted the prejudice rule in a case where §19-110 did not apply because the insurer was a public entity insurance

pool expressly excluded from the definition of "insurer" at §101(t).[1]  Nevertheless, the Court

adopted the prejudice rule as a matter of common law in cases where an insurer seeks to

disclaim coverage.  The Court held that "in accordance with the overwhelming weight of

authority of courts across the country and the expression of public policy by the Maryland

General Assembly as stated in  §19-110, we adopt the prejudice rule."  Id. at 96-97.[2]

### C. Sherwood Brands, Inc. v. Great American Ins. Co., 418 Md. 300, 13 A.3d 1268 (2011)

"Quite a workout" is how the Court of Appeals describes the legal thicket it undertakes

to navigate in Sherwood Brands, Inc. v. Great American Ins. Co., supra, at 1270.  But

navigating that thicket is essential in this case and Lancet has gone off course.  Lancet's

contention that, per Sherwood, §19-110 does not apply to claims-made-and-reported policies is

simply wrong.  Sherwood held exactly the opposite.  The simplest response to Lancet is to

quote footnote 21 of the opinion:

> Further, we disavow ourselves of language in Janjer, Maynard, and Rouse suggesting
> that T.H.E. be read to stand for the proposition that §19-110 does not apply to all
> "claims-made-and-reporting policies."  Notice provisions, **even in claims-made-and-
> reporting policies,** must be deemed covenants such that failure to abide by them
> constitutes a breach of the policy sufficient to make §19-110 applicable to such
> policies. (emphasis added)

---

[1] A risk retention group is an insurer for purposes of the Maryland Insurance Code.  See Md.
Ins. Code Ann. §101(v)(insurer is a person engaged in the business of entering into insurance
contracts); Md. Ins. Code Ann. §25-101(j)(4)(risk retention group is a corporate that is
chartered as a liability insurance company); and §25-101(j)(8)(risk retention group's activities
include solely the provision of liability insurance).

[2] Even if Lancet's preemption argument were correct (it is not), a further reason that §19-110
would apply is based on Nevada's choice of law rule.  Per Lancet's analysis, its operations
would be governed by Nevada law, meaning the whole of Nevada law, but under Nevada's
choice of law rule, the Restatement (2d) Conflict of Laws §188, an insurance policy issued in
Maryland to Maryland medical practices, and insuring a risk based in Maryland, would be
governed by Maryland law.  See Progressive Gulf Ins. Co. v. Faehnrich, 327 P.3d 1061 (Nev.
2014); Williams v. USAA, 849 P.2d 265 (Nev. 1993).

Rather than continue this "who is reading Sherwood correctly" merry-go-round, plaintiffs will lean on Judge Hollander who, in Navigators Specialty Insurance Co. v. Medical Benefits Administrators of MD, Inc., No. ELH-12-2076, 2014 WL 78822 at *12 to *14 (D. Md. Feb. 21, 2014), exhaustively analyzed and rejected the precise argument made here by Lancet while explaining the Sherwood Brands holding.[3]

Judge Hollander, writing in 2014, also explains why 2012 and 2013 opinions cited by Lancet at footnote 70 of its Memorandum interpret Maryland law on this point in a manner that is contradicted by Sherwood Brands.  At footnote 18 of her Navigators Specialty Insurance opinion, she points out, with all due respect, that the court reached an erroneous conclusion in FINRA v. Axis Ins. Co., 951 F. Supp.2d 826 (D. Md. 2013) because it relied on a portion of the Sherwood Brands opinion that set forth *prior* law in the Fourth Circuit, including decisions that the Court of Appeals expressly disavowed.  See Sherwood Brands, supra, at 326 n. 21, 13 A.3d at 1284 n. 21.  She further explained that the trial court decision in Minnesota Lawyers Mut. Ins. Co. v. Baylor & Jackson, PLLC, 852 F.Supp.2d 647 (D. Md. 2012), *aff'd*, 531 F. App'x 312 (4th Cir. 2013) was affirmed by the Fourth Circuit without reaching the question of whether §19-110 does or does not apply to claims-made-and-reported policies.  At footnote 14 of her opinion, Judge Hollander quoted with approval the dissenting opinion of Judge Thacker: "[c]ontrary to the district court's reasoning, however, Sherwood Brands makes clear that [§19-110] applies in this case to require [the insurer to] establish actual prejudice before it can properly disclaim coverage."  Minnesota Lawyers Mut. Ins. Co., 531 F. App'x 312, 323 (4th Cir. 2013).

---

[3] Judge Hollander agrees with the decision of Judge Bennett, in McDowell Bldg., LLC v. Zurich Am. Ins. Co., 2013 WL 5234250 (D. Md. Sept. 17, 2013) that §19-110 did apply to a claims-made-and-received policy.

Per <u>Sherwood Brands</u>, Lancet's pronouncement that its policy is a "claims-made-and-reported policy" leads to the application of §19-110 and to the requirement that Lancet demonstrate actual prejudice per the <u>Allstate v. State Farm</u>, <u>supra</u>, standard.

### III. LANCET CANNOT DEMONSTRATE PREJUDICE FROM AN INABILITY TO CONDUCT AN INVESTIGATION THAT IT NEVER ATTEMPTED

On receiving a copy of the Complaint filed in the Underlying Case, Lancet had two viable options: (a) it could have defended the case under a reservation of rights and, depending on the outcome, could have filed this declaratory judgment claim *based on the record of a fully-litigated Underlying Case*; or (b) Lancet could have immediately filed a declaratory judgment claim and moved to stay the Underlying Case until it was determined whether it did or did not have a duty to defend.  Lancet chose to do neither and now has no record to rely upon in order to demonstrate prejudice.

As Judge Hollander wrote in <u>General Accident Insurance Co. v. Scott</u>, 107 Md. App. 603, 615, 669 A.2d 773, 779 (Md. App. 1994), "an insurer may not disclaim coverage on the basis of prejudice that is only possible, theoretical, conjectural, hypothetical."  She added, "an insurer cannot assert prejudice with regard to its ability to conduct an investigation that it never even tried to conduct."  <u>Id</u>. at 617.  Yet that is precisely what Lancet is attempting to do.

Lancet did not defend its Insureds in the Underlying Case.  It now contends that it could not do so.  But Lancet has no idea what defenses counsel for its Insureds could have mounted because it never factually or medically investigated the claim.  The entirety of Lancet's investigation was:  (1) sending six letters to Dr. Malik/the Insureds; and (2) making two phonecalls – one to Dr. Malik's False Claims Act counsel and leaving a voice message with an Assistant Montgomery County State's Attorney.

At p. 3 of its Memorandum, Lancet boasts that it is owned, funded by, and directed by physicians who know what it takes to defend other physicians.  So many physicians, so willing to help, yet not one physician *ever* looked at Dr. Malik's 1/15/15 Consultation Note and stress test, plaintiffs' expert reports and plaintiffs' negligence allegations to inform Lancet whether the case was defensible?

Lancet's failure to *ever* have Mr. Castillo's records reviewed by a potential medical expert was documented in Plaintiffs' Memorandum in Support of Motion for Summary Judgment and need not be repeated here.  Now, when Lancet's sole motivation is to avoid paying a judgment, Lancet submits the opinion of Dr. Richard Schwartz, a cardiologist, to say that no valid conclusions regarding the standard of care can be drawn from the 1/15/15 encounter.[4]  Plaintiffs' medical expert, Dr. Alec Anders, refutes Dr. Schwartz' opinion:

> Dr. Malik's note contains all of the formal elements that an office note should include: subjective complaints, objective findings, assessment and plan.  ….

> In summary, the 1/15/15 Consultation Note and stress test printout reflect a full evaluation by Dr. Malik of Mr. Castillo's chest pain.  The circumstances of the 1/15/15 visit are documented and a reviewing physician has the information needed to evaluate whether Dr. Malik met the standard of care.

Exh. 31 to Plaintiffs' Memorandum.

It would be inefficient to require a trial of this case due to the irreconcilable difference between Drs. Schwartz and Anders on the issue of whether a reviewing physician could have formulated a standard of care opinion.  Plaintiffs have identified three physicians, one in this

---

[4] Dr. Malik was an internal medicine physician.  He was not a cardiologist.  See Exhibit 37 (deposition of Dr. Madden) at p. 15, lines 12-15.  Indeed, Dr. Madden recalled that Dr. Malik was asked by Providence Hospital to remove a cardiology sign and to stop practicing cardiology.  Id. Dr. Malik called himself a "nuclear cardiologist" which merely means that he had undertaken training in performing cardiac diagnostic tests.  The setting in which Mr. Castillo was seen primary care.  That is why plaintiffs' designated a primary care physician, Dr. Alec Anders.

case and two in the Underlying Case, each of whom had no problem opining as to the standard of care under the circumstances. The Court has before it the 1/15/15 Consultation Note, the accompanying stress test printout and the medical bill for that encounter. In its role as the gatekeeper of expert testimony, Fed. R. Evid. 104(a), 702, 703, the Court would either now or at trial have to determine whether the "circumstances" of that visit are sufficiently known that an expert could render an opinion regarding the standard of care. Plaintiffs ask the Court to make that determination at this juncture. If, as plaintiffs contend, those materials afford a sufficient quantum of evidence for a standard of care opinion, then Dr. Schwartz' contrary opinion is utterly moot and Lancet's pre-disclaimer failure to seek out a standard of care opinion was a failure to carry its burden of demonstrating actual prejudice.

### A.  Lancet made no attempt to learn the facts readily available to it.

That Lancet made no attempt to investigate this claim becomes glaringly apparent when one considers that the name "Dr. Kimberly Anderson" is typed as the "Physician" and "Attending Dr." on the printout of the 1/15/15 stress test. Exhibit F to Lancet's Memorandum, Exh. 3 to Plaintiffs' Memorandum.[5] Lancet's current, incorrect, position is that only Dr. Malik saw Mr. Castillo on 1/15/15 but the medical records from that date list Dr. Kimberly Anderson as well as Dr. Malik. Even assuming that as of August 10, 2015, Lancet believed that Dr. Malik was in Pakistan and never returning, Lancet could have had no such belief regarding Dr. Anderson. Yet Lancet apparently never contacted Dr. Anderson to inquire about her

---

[5] Lancet's repeated assertion that there is a missing stress test printout is a red herring taken from Dr. Madden's apparent belief that the test was completed. Mr. Castillo's stress test was stopped prematurely at 3 minutes due to chest pain. Because the test was not completed, that portion of the test that would analyze the data was not generated. Plaintiffs' cardiology expert, Dr. Fred Morady, testified that it was a worthless test due to the terrible quality of the recording and of no value because the patient only exercised for three minutes without reaching the target heart rate. Exh. 6 to Plantiffs Memorandum at p. 36, lines 2-18.

involvement in Mr. Castillo's care on 1/15/15. Any insurance company motivated to get to the bottom of what happened on 1/15/15 would have contacted Dr. Anderson. The fact that Lancet did not do so clearly points to an insurer that had already decided to avoid coverage and therefore did not need (or care) to investigate.

Dr. Kimberly Anderson practices medicine in Montgomery County and Prince George's County. Her office number is available through the internet.[6] Through discovery in the Underlying Case, it was learned that Dr. Anderson in fact had no involvement in Mr. Castillo's care. She had stopped working with Dr. Malik in 2013. Her name was automatically printed on the stress test print out because the machine was so-programmed and that pre-set was never updated. But Lancet could not possibly have known that fact unless it spoke either with Dr. Anderson, Dr. Malik, Dr. Madden or with Isis Diaz. And it never did.

### B. Lancet never attempted to speak with Isis Diaz.

Lancet's **Insureds**, Advanced Walk-In and Union Multi-Care, were medical practices with multiple employees. To date, Lancet has apparently never spoken with any of them.

Isis Diaz was the office manager for the Lancet Insureds. Exh. 38 at ¶ 1. Ms. Diaz continues to work at the same address where Advanced/Union practice was located. Id. Her current employer, Elite Multi Specialty Clinic, LLC purchased the Advanced Walk-In practice and operates from the same location. Post-sale, Elite Multi Specialty became the custodian of medical records for Advanced/Union patients, a fact that was indicated by the fax header on the 1/15/15 Consultation Note faxed to the Maloney Law Office on 6/05/15 and provided to Lancet on July 2, 2015.

---

[6] She formerly worked with Dr. Malik, Dr. Madden and Ms. Diaz; she now works part-time with Dr. Madden and Ms. Diaz at Elite Multi Specialty Clinic.

Ms. Diaz worked with Dr. Malik for many years. Lancet's "concerns" regarding the Consultation Note, Exhibit E to Lancet's Memorandum, could have been readily set at ease had Lancet chosen to speak with Ms. Diaz. Ms. Diaz would have explained that Advanced/Union Multi-Care made and kept patient medical records using an electronic medical record (EMR) system. Exh. 38 at ¶ 2. Ms. Diaz would have explained that before a patient was seen by Dr. Malik or by Dr. Madden, that patient was seen by a medical assistant who would have taken the patient's vitals and would have recorded those vitals directly in the EMR. Id. Thus, Lancet's repeated assertion that Dr. Malik was the only person who interacted with Mr. Castillo at the visit is incorrect. Lancet would further have learned that, except for vitals, all of the information in the patient's EMR for a given visit would be inputted by the physician seeing that patient.

Lancet would have learned that in the case of Mr. Castillo's 1/15/15 Consultation Note all of the information in that Note, with the exception of Vital Signs (entered by the medical assistant) would have been entered directly by Dr. Malik. Id. at ¶3. Lancet would further have learned that upon Ms. Diaz' knowledge, information and belief, the contents of the 1/15/15 Consultation Note remain unchanged from the time when Dr. Malik recorded that information. Id. at ¶4.

Lastly, Lancet would have learned that Ms. Diaz printed the 1/15/15 Consultation Note and faxed it to the undersigned on 6/05/15 as she was asked and authorized to do. Id. ¶¶2, 4. Lancet would have learned that the phrase "Electronically signed by Ishtiaq Malik on 06/05/2015 at 10:06 AM EDT" appears at the top of page two of the 1/15/15 Consultation Note because Ms. Diaz' act of printing that record from the EMR on 6/05/15 caused that message to to be automatically affixed to the top of page two of the document. That fact is made clear by

comparing the Exhibits A and B to Ms. Diaz' Declaration.  Exhibit A is the Consultation Note faxed to plaintiffs' counsel on 6/05/15 and bears, on page two, the message "Electronically signed by Ishtiaq Malik on 06/05/2015 at 10:06 AM EDT."  Exhibit B is the same Consultation Note that was printed and sent by e-mail to Dr. Richard Akoto on 7/02/15.  Exhibit B bears the message "Electronically signed by Ishtiaq Malik on 07/02/2015 at 11:00 AM EDT."

A reasonable investigation by Lancet would have led it to Ms. Diaz and Ms. Diaz would have led Lancet to the plain fact that the 1/15/15 Consultation Note is Dr. Malik's unchanged, contemporaneous record of his medical interaction with Juan Castillo.

### C. Lancet never attempted to speak with Dr. Lendicita Madden.

So too, a reasonable investigation by Lancet would have led it to Dr. Lendicita Madden, Dr. Malik's colleague of many years at the Lancet Insureds practice.  Dr. Madden's work phone number was readily available through the internet.  She too practices with Elite Multi Specialty Clinic at the same office address where Advanced/Union were located.  In the event that Lancet had not previously been able to locate the practice's office manager, Dr. Madden could have put them in touch:  Dr. Madden and Ms. Diaz work together.

Dr. Madden would have confirmed that the handwritten initials on the 1/15/15 stress test printout, where it is handwritten "Stopped due to CP (chest pain)." was Dr. Malik's handwriting.  Exhibit 37 at p. 30, lines 2-3.  Dr. Madden could have described the office procedures involving the use of medical assistants to take patients' vitals before seeing the physician, regarding the use of interpreters for Spanish-speaking patients (such as Mr. Castillo). It is not presently known, but certainly would have been useful for Lancet to ask, whether Dr. Madden recalls the names of Advanced/Union employees as of January 2015 such as the medical assistant(s), receptionist, translator(s), etc.

**D. Lancet offers no possible motive for Dr. Malik to have left important medical details out of his Consultation Note.**

Because it cannot document an investigation into the claim, Lancet presents the Court with a litany of rhetorical "what-ifs." What if, Lancet speculates, Dr. Malik, concerned that Mr. Castillo was undergoing a cardiac emergency, told Mr. Castillo to go to the nearest emergency room? The suggestion cannot be taken seriously. First, Dr. Malik's contemporaneous medical note makes no mention of a referral to the ER, or to a cardiologist. There is no record of an ambulance being called. Was Mr. Castillo expected to drive himself to the ER in the midst of a medical emergency? Second, Mr. Castillo was given a prescription for a thirty (30) day supply of a heart medication (which he filled and took). Dr. Malik's "plan" was a 30-day course of medication, not an emergency referral to either an ER or a cardiologist. Third, Dr. Malik did not code the visit as an acute cardiac episode or as an acute anything. Exh.   The ICD code given by Dr. Malik is "Chest pain, other – 786.59." Exh. 3.  The visit was not coded, for example, as Cardiac Arrest (ICD Code 4275), as Heart Failure (ICD Code 4289), or as Acute Systolic or Diastolic Heart Failure (ICD Codes 428.21 and 428.31) or as unstable angina.  Lastly, Mr. Castillo went home from the visit.  He did not go to an ER, and he did not go to see a cardiologist because he was never told to do so.  He did exactly what he was told to do:  fill and take the prescribed heart medication that he obtained the very next day and took until the day he died.

The Court should consider reasonable inferences from Dr. Malik's contemporaneous medical record.  FDIC v. Cashion, 720 F.3d 169 (4th Cir. 2013).  The Court should reject the unreasonable inferences proposed by Lancet.  Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002).  Lancet's speculation is not only contrary to the contemporaneous record, it is contrary to the practice of medicine in general.  What physician would determine that his patient is

undergoing a medical emergency and then fail to document that?  As plaintiffs' medical expert, Dr. Alec Anders states:

> I would find it highly suspicious, if, hypothetically, months after this encounter Dr. Malik were to recall some critical information that was not documented in the 1/15/15 note.  One purpose of written office notes is to allow the author or a subsequent physician to know the clinical information obtained and recommendations given at a prior visit.

Exh. 31 to Plaintiffs' Memorandum.

Lancet contends that the hypothetical details that Dr. Malik might remember six or more months after Mr. Castillo's visit, and that he never mentioned until after learning that suit was filed, may have afforded a *credible* defense.  The imagined courtroom exchange would be a cross-examiner's dream:  Dr. Malik, previously found liable for overbilling millions from the Medicare program, testifying under oath regarding the exculpatory details of a single office that he never bothered to record anywhere until after he was sued.  Lancet is chasing windmills. Lancet should have defended its Insureds using the information available to it, by gathering more information through a reasonable investigation and by securing a favorable expert witness on either standard of care or proximate cause, or both.

### III. MARYLAND COURTS DO NOT FIND ACTUAL PREJUDICE WHERE AN INSURER HAD THE OPPORTUNITY TO INFLUENCE THE CLAIM OUTCOME

Maryland decisions, state and federal, applying the actual prejudice standard to insurer disclaimers, can be categorized depending on what impact the insured's non-cooperation had on the underlying litigation.

## A. **Actual prejudice is found when the Insurer is presented with a *fait accompli*.**

One category of cases can be labeled *fait accompli* because, when the insurer learns of the claim events have reached the point where it has no ability to influence the outcome of the claim. Maryland courts find actual prejudice when the insurer's hands are tied.

The prime example of this is Allstate v. State Farm, supra.  The non-cooperation of State Farm's insured (Kirby) prompted the opposing parties to obtain discovery sanctions from the trial court which precluded Kirby (or her State Farm counsel) from introducing any evidence at trial concerning the circumstances surrounding the accident.  Id. at 835.[7]  In discussing the decision, at p. 15 of its Memorandum, Lancet ignores the case-determinative fact that it was the evidence preclusion order, rather than Kirby's non-cooperation, that was the actual prejudice to State Farm.  The Court made this clear:  "[B]y reason of [Kirby's] willful failure to cooperate in providing discovery … and her refusal to attend trial, State Farm was precluded from offering *any* evidence in defense of the claim," id. at 843 (underline added), and later in the opinion the Court stated, "[t]he prejudice [to State Farm] lies in the fact that there was a credible defense to be presented at trial and that Kirby's non-cooperation precluded State Farm from even presenting that defense."  Id. at 844.[8]  Notably, unlike Lancet, State Farm did participate in and defend the case through trial.

In Prince George's County v. Local Government Insurance Trust, 388 Md. 162, 879 A.2d 81 (2005), the Court found that actual prejudice was demonstrated where a $1,597,670

---

[7] Lancet speculates that sanctions would have been entered against its Insureds in the Underlying Case.  Not true.  Precisely to avoid the litigation handcuffs imposed on State Farm in Allstate v. State Farm, supra, which led to the finding of actual prejudice, the undersigned would never have sought litigation sanctions.

[8] A further distinction between State Farms handling of the claims against Kirby and Lancet's conduct in this case is the fact that State Farm *had counsel defend its insured throughout the case and at trial*.  But more on that infra.

jury verdict had been entered against the insured before the insurer was even notified of the claim.

Similarly, Washington v. Federal Kemper Insurance Company, 60 Md. App. 288, 482 A.2d 503 (Md. App. 1984), was a declaratory judgment prompted by an insurer's denial of coverage for a claim first brought to its attention after a jury verdict against its insured was rendered. The trial court found that the insurer had demonstrated actual prejudice because it did not get notice of the suit until "after the horse was literally gone and a verdict was in." Id. at 294. That finding was affirmed on appeal. Id. at 297. See also, McDowell Building, LLC v. Zurich American Ins. Co., RDB-12-2876 (D. Md. May 7, 2015)(actual prejudice found based on the insured settling with and releasing another party without Zurich's approval thereby forfeiting a right of contribution that Zurich may have pursued).

### B. **Conversely, when the Insurer can defend the underlying case it must do so.**

A separate line of Maryland cases stands for the proposition that when the insurer is notified about a claim at a point when it has the opportunity to defend its insured, then it needs to do so.

In Harleysville Ins. Co. v. Rosenbaum, 30 Md. App. 74, 351 A.2d 197 (Md. App. 1976), the insured failed to notify his insurer about an accident and then died before the insurer could obtain any information from him. The insurer disclaimed coverage and that prompted a declaratory judgment action in which the insurer asserted actual prejudice. The Court of Special Appeals disagreed holding that while an insured's failure to cooperate may be a breach of the policy's cooperation clause that in and of itself does not establish actual prejudice. Id. at 85. The Court remanded the case for a jury trial which the insurer "should defend" without prejudice to its ultimate rights. See also Warren v. Hardware Dealer's Mutual Fire Insurance

Co., 244 Md. 471, 224 A.2d 271 (1966) (insurer must defend auto case despite its insured's failure to cooperate).

Plaintiffs have found only one Maryland case in which the insurer took the approach that Lancet has taken here. In Ball v. NCRIC, Inc. 174 F. Supp.2d 361 (D. Md. 2001) *rev'd*, 40 Fed. Appx. 760 (4th Cir. 2002), plaintiff alleged that a physician treating her for headaches and depression routinely administered narcotics and then sexually assaulted her. The physician was indicted on unrelated criminal charges and fled the country for three years. Defendant's malpractice insurer cancelled his malpractice insurance upon learning of the indictment. Plaintiff filed a civil suit against her physician, NCRIC refused to defend, and plaintiff obtained a $310,000 verdict. Thereafter, plaintiff sued NCRIC on the verdict. The trial court granted summary judgment to NCRIC finding actual prejudice on the grounds, *inter alia,* that without the physician's version of the events NCRIC could not determine whether the claims alleged were intentional torts (and therefore outside of policy coverage). On appeal, the trial court was reversed on the grounds, *inter alia*, that NCRIC had not demonstrated prejudice from any event other than its own decision not to investigate.[9]

NCRIC advanced the same arguments that Lancet asserts here but in a factual context that bears no similarity to Mr. Castillo's office visit.[10] The case was about a sexual assault not a medical encounter. Obviously, the repeated alleged sexual assaults of Ms. Ball by her physician were not recorded in a contemporaneous medical record. Therefore, each side's testimony was the only available evidence. In contrast, Juan Castillo's visit was a standard

---

[9] The case was remanded and again decided in NCRIC's favor based on the trial court's determination that the alleged acts were intentional torts not covered by NCRIC's policy.

[10] The appellate court rejected NCRIC's argument that it was prejudiced by receiving notice of the claim from plaintiffs' counsel rather than from its insured as the policy required. Ball v. NCRIC, 40 Fed App'x 760, 763 (4th Cir. 2002).

medical encounter for which there is a contemporaneous medical record, stress test printout and medical bill.

## IV.  THE CASES CITED BY LANCET DO NOT SUPPORT ITS HANDLING OF THIS CLAIM

Both Med Protective Co. v. Bubenik, 594 F.3d 1047 (8th Cir. 2010) and Med. Assurance Co. v. Miller, 779 F. Supp.2d 902 (N.D. Ill. 2011), cited by Lancet, illustrate that a liability insurer seeking to frame a non-cooperation policy defense, needs to litigate the underlying case. Under the unique facts of Bubenik, and applying Missouri law, the Court found that the dentist-defendant had given specific potentially exculpatory information regarding his patient's death to the investigating dental board but the dentist refused to testify regarding those facts and refused to allow the apparently privileged report to be used.  Unlike Lancet, however, Bubenik's liability carrier *defended the underlying case through to a jury verdict.*  Accordingly, when the declaratory judgment action was decided, the Court had the entire litigation record from the underlying case as defended, albeit unsuccessfully, by Bubenik's carrier.  That carrier, unlike Lancet, had a basis for arguing that despite its good faith effort defend its insured and to avoid an adverse verdict, it could not do so due to the non-cooperation prejudice.  Lancet can demonstrate no comparable good faith effort to defend the claim.

Similarly, in Med. Assurance Co. v. Miller, 779 F. Supp.2d 902 (N.D. Ill. 2011), the insurer defended the underlying malpractice claim.  Miller is "litigation handcuffs" case analogous to Allstate v. State Farm, supra.  *In the course of defending the malpractice claim,* in which two of three health care panel opinions found no proximate cause (and which opinions would have been admissible at trial), Miller's insurer was slapped with a default order that precluded the defense from litigating any issue at trial other than damages.  Id. at 920.  Just as

State Farm had, but could not use at trial, potentially exculpatory evidence, Miller's insurer was not allowed to introduce favorable evidence that it had on the issue of proximate cause.

The common denominator in each of these cases, Miller, in Bubenik and Allstate v. State Farm, is that the malpractice carrier litigated the underlying case fully and only then, after an adverse verdict, made its prejudice argument in a declaratory judgment claim.  At that point, the reviewing court could assess the issue of prejudice having seen the script of the underlying case.  Here, the Court has no way of knowing how the Underlying Case would have turned out had Lancet participated, whether a jury would or would not have found for Lancet's Insureds on liability or proximate cause, or would have cast all blame on co-defendant Dr. Akoto.  And the fault for that missing record rests with Lancet.

### Conclusion

For all the foregoing reasons, plaintiffs respectfully request that their Motion for Summary Judgment be granted and the Lancet's Cross-Motion for Summary Judgment be denied.

Respectfully submitted,

**MALONEY LAW OFFICE, LLC**
/S/
Matthew P. Maloney, Esq. (Bar No. 12077)
10400 Connecticut Avenue
Suite 602
Kensington, MD 20895
P:  (240) 242-4281
F:  (240) 242-4285
mmaloney@maloney-law.com
Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I, Matthew P. Maloney, Esq., hereby certify that a copy of the foregoing document was served via ECF this 27th day of September, 2016 on the following:

Chad E. Kurtz, Esq.
Cozen & O'Connor
1200 19th St., NW
Suite 300
Washington, DC  20036
Counsel for Lancet Indemnity, RRG, Inc.

John David Dickenson, Esq.
Matthew B. Criscuolo, Esq.
Cozen & O'Connor, P.C.
One North Clematis St.
Suite 510
West Palm Beach, FL  33401
Counsel for Lancet Indemnity, RRG, Inc.

_____/S/_____
Matthew P. Maloney, Esq. (Bar No. 12077)


I, Matthew P. Maloney, Esq., hereby certify that a copy of the foregoing document was served of the following via U.S. International Mail, postage prepaid, this 27th day of September 2016 on the following:

Advanced Walk In Urgent Care, LLC
c/o Ishtiaq Malik, MD
37 Civic Centre
Shop #2, Phase 4
Bahria Town, Islamabad, Pakistan

Union Multi-Care Medical Center, Inc.
c/o Ishtiaq Malik, MD
37 Civic Centre
Shop #2, Phase 4
Bahria Town, Islamabad, Pakistan

_____/S/_____
Matthew P. Maloney, Esq. (Bar No. 12077)