IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| CLAUDIA M. MORA et al. | | |
| | * | |
| Plaintiffs, | | |
| | * | |
| v. | | Civil Action No. PX 16-960 |
| | * | |
| LANCET INDEMNITY RISK RETENTION | | |
| GROUP, INC., | * | |
| | | |
| Defendant. | * | |
| | ****** | |

## MEMORANDUM OPINION

Pending in this insurance action is a motion for summary judgment filed by Plaintiffs

Claudia Mora, her two children, and Juan Carlos Castillo and a cross-motion for summary

judgment filed by Defendant Lancet Risk Retention Group, Inc. (ECF Nos. 74, 76). The issues

have been fully briefed and a hearing was held on Friday, February 24, 2017. For the reasons that

follow, both motions are denied.

## I.    BACKGROUND

This case arises out of an insurance coverage dispute between insurer Lancet Risk

Retention Group, Inc. ("Lancet"), its insureds, and several plaintiffs who have filed suit against

the insureds.  In 2014, Lancet issued a claims-made-and-reported policy[1] (the "Policy") to two

interrelated medical practices, Union Multi-Care Medical Center, Inc. and Advanced Walk-In

Urgent Care, LLC, both located in Silver Spring, Maryland. ECF No. 74-3 at 2. Dr. Ishtiaq A.

Malik ("Dr. Malik") owned and operated both practices. He and his colleague, Dr. Lendicta

Madden ("Dr. Madden"), were additional named insureds on the Policy. *See* Insurance Policy,

---

[1] A claims-made-and-reported policy is a policy in which a claim must be both made against the insured
and reported to the insurer during the policy period for coverage to apply.

ECF No. 76-5 at 12. The Court will refer to the two medical practices and Dr. Malik collectively as the "Insureds." Union Multi-Care Medical Center and Advanced Walk-In Urgent Care are entities solely owned by Dr. Malik and thus Dr. Malik serves as their representative. The Policy was in effect from July 1, 2014 through July 31, 2015.

On January 15, 2015, Juan G. Castillo visited Dr. Malik at his Silver Spring offices because Castillo was experiencing chest pains. *See* Consultation Note, ECF No. 75-2 at 2. According to Dr. Malik's consultation note, Mr. Castillo arrived complaining of atypical chest pain associated with shortness of breath a few times day. *Id.* Mr. Castillo's history was recorded, his vitals were taken, and a physical exam was performed. Based on his assessment, Dr. Malik prescribed Mr. Castillo a thirty-day supply of heart medicine. *Id.* Eight days later, Mr. Castillo died from a sudden cardiac event while at work.

On July 15, 2015, Mr. Castillo's widow, Claudia Mora, and two of their minor children (the "Plaintiffs") filed a medical malpractice claim against the Insureds and others with the State of Maryland Health Claims Alternative Dispute Resolution Office ("HCADRO") and elected to waive arbitration. *See* Ex. 10, ECF No. 75-3 at 18–43. In that action, the Plaintiffs alleged that Dr. Malik and the rest of the Insureds negligently failed to refer Mr. Castillo to a cardiologist after evaluating him, leaving Castillo's heart condition undiagnosed and untreated which resulted in his death. *Id.* Before filing their claim with HCADRO on July 2, 2015, Plaintiffs' counsel put Lancet on notice in writing that Plaintiffs' lawsuit against its Insureds was forthcoming. ECF No. 22 at 7; Letter, Ex. 8, ECF No. 75-3 at 14. On July 24, 2015, Plaintiffs filed the medical malpractice/wrongful death case in the Circuit Court for Montgomery County, naming as defendants the Insureds and Richard O. Akoto.[2] *See Mora v. Advanced Walk-In Urgent Care*

---

[2] Prior to seeing Dr. Malik, Mr. Castillo saw Dr. Richard O. Akoto multiple times for chest pain. Similar to the claim against the Insureds, Plaintiffs contended that Dr. Akoto breached the standard of care by,

*LLC*, Case No. 407276-V (Montgomery Cnty. Cir. Ct. filed July 24, 2015) [hereinafter the "Lawsuit"]. That same day, Plaintiffs' counsel sent a letter enclosing the complaint and the related filings to Lancet and Lancet's outside counsel for this matter. ECF No. 22-4; ECF No. 75-4 at 6.

After Plaintiffs' counsel informed Lancet of the impending Lawsuit, Lancet's counsel immediately reached out to the Insureds via telephone, e-mail, and other correspondence to investigate Plaintiffs' claims. ECF No. 76-1 at 11–12. Specifically, on July 24, 2014, Lancet advised via letter Union Multi-Care, Advanced Walk-In, and Dr. Malik at Dr. Malik's last-known personal residence and his last-known email address, that it: (i) received the July 2, 2015 letter from Plaintiffs; (ii) appointed defense counsel on the Insureds' behalf; (iii) defense counsel required the Insureds' and Dr. Malik's assistance and cooperation in discussing the allegations in the July 2, 2105 letter; and (iv) its investigation remained ongoing and its defense under the Policy was being provided under a strict reservation of rights. *See* Letter, ECF No. 76-14. Lancet received no response.

On August 6, 2015, Lancet sent another letter to Dr. Malik again requesting that he cooperate with the pending litigation and referencing Lancet's prior attempts to contact him. *See* Letter, ECF No. 76-17. No one responded. Lancet then contacted Dr. Malik's former counsel in a False Claims Act action who informed Lancet that Dr. Malik had moved to Pakistan and did not intend on returning to the United States. *See* Letter, ECF No. 76-18.

Lancet sent several more letters to Dr. Malik at his last known address in Silver Spring and a coverage denial letter of October 16, 2015 explaining that Lancet would not provide Dr.

---

*inter alia*, failing to arrange for a cardiac consult. Plaintiffs' claims against Dr. Akoto and his practice have been settled.

Malik or the other Insureds a defense in the Lawsuit for Dr. Malik's failure to cooperate in violation of the Policy. ECF Nos. 75-1 at 42–47, 76-19, 76-20.

On February 1, 2016, Plaintiffs' counsel informed Lancet in writing that he had learned of Dr. Malik's whereabouts in Pakistan and provided Lancet with two possible addresses. ECF No. 76-22. Lancet then sent packages to these two addresses dated February 26, 2016, referencing Lancet's prior attempts to communicate with him. Lancet told Dr. Malik that because Lancet was unable to reach him in an effort to investigate and defend against the claims in the Lawsuit, Lancet disclaimed coverage. *See* February 26, 2016 Letter, ECF No. 76-23.

Aside from responding to a subpoena request from Plaintiffs, Lancet did not participate in the Lawsuit. Lancet asserts it did not participate because without the Insureds' cooperation, Lancet could not meaningfully defend against Plaintiffs' allegations. ECF No. 75-4 at 7. No attorney entered an appearance for the Insureds and none of the Insureds participated in the trial proceedings.

On March 11, 2016, the circuit court entered an Order of Default against the Insureds. *See* Order, ECF No. 75-4 at 19–20. The Insureds never moved to vacate the Order. On August 8, 2016, Lancet moved to intervene for a limited purpose of damages. The Montgomery County circuit court granted this motion over the objection of Plaintiffs' counsel. *See* Order, ECF No. 75-4 at 26. On August 11, 2016, the circuit court entered a judgment against the Insureds, jointly and severally, for $2.56 million. *See* Entry of Judgment, ECF No. 75-4 at 30.

On March 2, 2016 Claudia Mora, her two children, Juan Carlos Castillo, Advanced Walk-In Urgent Care, LLC, Union Multi-Care Medical Center, Inc., and Dr. Richard Akoto filed this declaratory judgment action against Lancet in the Circuit Court for Montgomery County seeking a judgment declaring that the Insureds are covered by the Policy for claims asserted

against them in the Lawsuit. *See* Amended Complaint, ECF No. 6. Lancet removed the case to

this Court and filed a counterclaim. ECF Nos. 1 and 22. The counterclaim seeks a declaration

that the Policy is void because of the Insureds' failure to comply with the Policy's notice and

cooperation provisions. ECF No. 22 at 15–16. Plaintiffs moved for summary judgment and

Lancet filed a cross-motion for summary judgment. For the reasons that follow, both motions are

denied.

## II.    STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to

current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any

genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). If sufficient

evidence exists for a reasonable jury to render a verdict in favor of the party opposing the

motion, then a genuine dispute of material fact is presented and summary judgment should be

denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere

existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to

defeat a motion for summary judgment. *Id.* at 252. The facts themselves, and the inferences to be

drawn from the underlying facts, must be viewed in the light most favorable to the opposing

party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir.

2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by

affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for

trial, Fed. R. Civ. P. 56(c)(1).

When a court is called upon to decide cross-motions for summary judgment, it must

review each motion separately on its own merits to decide whether either party

deserves judgment as a matter of law. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).

Thus, as with any motion for summary judgment, the court must review the facts and reasonable

inferences therefrom in the light most favorable to the party opposing that motion. *Id.*

## III.      ANALYSIS

### A.      Lancet's Cross-Motion for Summary Judgment[3]

Lancet contends that it properly denied coverage because the Insureds failed to notify

Lancet of the Lawsuit before the Policy expired, and further failed to cooperate in investigating

and defending the claims. As a result, Lancet need not reimburse the Insureds for the damages

and costs it incurred in the Lawsuit. Plaintiffs respond that before Lancet can disclaim coverage

under either of these provisions, it must show that the Insureds' failure to notify or cooperate

"actually prejudiced" it pursuant to Maryland's "notice-prejudice" rule.[4] *See* Md. Ins. Code Ann.

§ 19-110.  Lancet, however, notes that § 19-110 is preempted by the federal Liability Risk

Retention Act ("LRRA"), 15 U.S.C. § 3901 *et seq.*

Here, it is undisputed that Lancet is a risk retention group governed by the LRRA. The

Court, therefore, first addresses the LRRA's impact on the substantive law governing this

analysis.

### i.      Federal Preemption Law and the Liability Risk Retention Act of 1986

Federal preemption emanates from the Constitution's Supremacy Clause. *See* U.S. Const.

art. VI, cl. 2. In addressing a preemption issue, a court's first task is to determine whether

---

[3] The parties agree that Maryland law applies in this action. *See* Response to Request for Admissions, ECF No. 75-4 at 9.

[4] Maryland's notice-prejudice rule also applies to an insurance policy's cooperation provision.

Congress, in enacting a federal law, intended to preempt state law covering the same subject matter. *See California Fed. Savings & Loan Ass'n*, 479 U.S. 272, 280–81 (1987). Once the court determines congressional intent with regard to preemption, it must then turn to the the the scope of that preemption. *See Duvall v. Bristol–Myers–Squibb Co.*, 103 F.3d 324, 328 (4th Cir. 1996).

Two presumptions guide this inquiry. *See id.* First, "'the purpose of Congress is the ultimate touchstone' in every preemption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103 (1963)). Second, a court applies "the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). This presumption of non-displacement "is strongest when Congress legislates 'in a field which the States have traditionally occupied.'" *S. Blasting Servs., Inc. v. Wilkes Cnty., N.C.*, 288 F.3d 584, 590 (4th Cir. 2002) (quoting *Medtronic, Inc.*, 518 U.S. at 485). Insurance is one of those traditional state-occupied areas. *See FMC Corp. v. Holliday*, 498 U.S. 52, 53 (1990).

In 1981, Congress enacted the Products Liability Risk Retention Act ("PLRRA"), allowing "'product manufacturers to purchase insurance on a group basis at more favorable rates or to self-insure through insurance cooperatives called 'risk retention groups.'" *Ophthalmic Mut. Ins. Co. v. Musser*, 143 F.3d 1062, 1064 (7th Cir. 1998) (quoting H.R. Rep. No. 190 at 4 (1981), *reprinted in* 1981 U.S.C.C.A.N. 1432, 1432). However, risk retention groups faced difficulties in providing insurance nationwide because they were obligated, like traditional insurance companies, to obtain licenses and comply with the regulations of every state in which they seek to do business. *See* Vonda Mallicoat Laughlin, *State Laws Restricting the Operation of Risk Retention Groups–Necessary Protection or Illegal Regulation?*, 60 Drake L. Rev. 67, 68 (2011) (citing Baird Webel, Cong. Research Serv., RL 32176, *The Risk Retention Acts: Background and*

*Issues* 2 (2003)). "This could mean complying with a myriad of state regulations to provide insurance nationwide." *Soyoola v. Oceanus Ins. Co.*, 986 F. Supp. 2d 695, 702 (S.D.W. Va. 2013) (citing Webel, *supra*, at 2).

The PLRRA reduced the regulatory burden on risk retention groups by limiting their compliance requirements to the regulations of its chartering state; once this is achieved, a risk retention group could provide products liability insurance nationwide without any further compliance in non-chartering states. *Nat'l Warranty Ins. Co. v. Greenfield*, 214 F.3d 1073, 1075 (9th Cir. 2000). Thus, the objective of the PLRRA was to promote "the efficient operation of risk retention groups by eliminating the need for compliance with numerous non-chartering state statutes that, in the aggregate, thwart the interstate operation [of] . . . product liability risk retention groups." *Id.* (quoting H.R. Rep. No. 190, 97th Cong., 1st Sess. 12 (1981), *reprinted in* 1981 U.S.C.C.A.N. 1432, 1441).

In 1986, Congress enacted the LRRA, amending the PLRRA. *See* Pub. L. 99–563, 100 Stat. 3170 (codified as amended at 15 U.S.C. §§ 3901–06). The LRRA extended the protections of the PLRRA to all types of insurance offered by risk retention groups, not just products liability insurance. *Mears Transp. Grp. v. Florida*, 34 F.3d 1013, 1017 (11th Cir. 1994). However, in response to the increased scope of the LRRA, Congress also created certain exemptions to the law, carving out areas in which the states could regulate non-resident risk retention groups. *Id.*

The LRRA thus created "tripartite scheme" in which chartering and non-chartering states participate in regulating risk retention groups. *Nat'l Home Ins. Co. v. State Corp. Comm'n of Com. of Va.*, 838 F. Supp. 1104, 1110 (E.D. Va. 1993). Under the LRRA, a risk retention group is primarily governed by its chartering state's regulations. *Id.* "Only the chartering jurisdiction

8

may directly regulate the formation and every day operations of a risk retention group." *Id.* A non-chartering state, by contrast, may regulate a risk retention group only in several discrete areas as identified by the LRRA. *See id.* at 1111.

In so enacting this tripartite scheme, Congress expressly declared its intent to circumscribe and control which state insurance law regulates risk retention groups. Section 3902(a)(1) clearly states that the LRRA preempts any state law or regulation that would "make unlawful, or regulate, directly or indirectly, the operation of a risk retention group [.]" U.S.C. § 3902(a)(1). This allows the LRRA to prevent discriminatory treatment of non-resident risk retention groups and subject risk retention groups to the regulation in one jurisdiction instead of several. *See Attorneys' Liab. Assurance Soc'y, Inc. v. Fitzgerald*, 174 F. Supp. 2d 619, 635 (W.D. Mich. 2001) ("However, the LRRA was designed not only to prevent discriminatory treatment of non-resident risk retention groups, but also to preempt regulation of risk retention groups by states other than the chartering state." (citations omitted)); *Mears Transp. Grp. v. State*, 34 F.3d at 1017 ("Congress explained that the purpose of these preemption provisions was to facilitate 'the efficient operation of risk retention groups by eliminating the need for compliance with numerous non-chartering state statutes that, in the aggregate, would thwart the interstate operation [of] product liability risk retention groups.'" (quoting H.R. Rep. No. 190, 97th Cong., 1st Sess. 12 (1981), *reprinted in* 1981 U.S.C.C.A.N. 1432, 1441).

While the Fourth Circuit has yet to directly review the LRRA's preemptive effect, courts across the country have concluded that the LRRA's preemption is sweeping and covers most state insurance laws. *See Wadsworth v. Allied Professionals Ins. Co.*, 748 F.3d 100, 101 (2d Cir. 2014) (explaining that the LLRA "contains sweeping preemption language that sharply limits the authority of states to regulate, directly or indirectly, the operation of risk retention groups

chartered in another state"); *Nat'l Warranty Ins. Co. v. Greenfield*, 214 F.3d 1073, 1077 (9th Cir.

2000) ("Even with a general presumption that insurance law should ordinarily be regulated under

state law, as reinforced by the McCarran–Ferguson Act, the language and purpose of the LRRA

clearly indicate an intent to preempt state laws regulating [risk retention groups].").

Here, Lancet is chartered in Nevada, and thus under the LRRA, Nevada is the only state

which can directly regulate Lancet. Non-chartering states like Maryland, however, exercise more

limited oversight as set forth in the LRRA. In light of Congress' express intent to preempt most

state laws regulating non-resident risk retention groups to eliminate discrimination and promote

efficiency, the next step is to determine whether Maryland's notice and prejudice statute,

Maryland Insurance Code Ann. § 19-110, falls within the LRRA's narrower scope as applied to

non-chartering states.

Maryland Insurance Code Ann. § 19-110 provides that

[a]n insurer may disclaim coverage on a liability insurance policy on the ground
that the insured or a person claiming the benefits of the policy through the insured
has breached the policy by failing to cooperate with the insurer or by not giving
the insurer required notice only if the insurer establishes by a preponderance of
the evidence that the lack of cooperation or notice has resulted in actual prejudice
to the insurer.

Md. Ins. Code Ann. § 19-110.

By its terms, § 19-110 is meant to regulate, "directly or indirectly," the operation of

insurers which include risk retention groups. Section 19-110 then identifies the burden of proof

that the insurer must meet coverage may be disclaimed under a policy's notice or cooperation

provisions. Indeed, the very genesis of § 19-110 was to abrogate state common law on whether

actual prejudice need be shown where insureds failed to provide notice of the claim. *See*

*Sherwood Brands, Inc. v. Hartford Acc. & Indem. Co.*, 347 Md. 32, 41–42 (1997); *Minnesota*

*Lawyers Mutual v. Baylor & Jackson, PLLC*, 852 F. Supp. 2d 647, 659 (D. Md. 2012). Because

§ 19-110 on its face provides substantive change to the common law governing insurance contracts of this kind, it falls within the LRRA's broad preemptive reach.[5]

Plaintiffs argue that even if § 19-110 is preempted, this Court must nonetheless look to Maryland common law governing the interpretation of the instant insurance policy based on the LRRA's exception for the laws of non-chartering states which govern the interpretation insurance contracts. Section 3901(b) of the LLRA provides:

> Nothing in this chapter shall be construed to affect either the tort law *or the law governing the interpretation of insurance contracts of any State*, and the definitions of liability, personal risk liability, and insurance under any State law shall not be applied for the purposes of this chapter, including recognition or qualification of risk retention groups or purchasing groups.

15 U.S.C. § 3901(b) (emphasis added). Plaintiffs argue that § 19-110 is a "law governing the interpretation of insurance contracts" and therefore is expressly excluded from the LRRA's reach. ECF No. 78 at 3. Section 19-110 does not assist in interpreting existing terms of an insurance contract, but imposes an additional burden on the insurer before it may disclaim coverage based on a lack of notice or cooperation, despite what the particular insurance policy says. Thus, § 19-110 does not fall within § 3901(b). However, Maryland common law governing the interpretation of terms within an insurance policy still applies where necessary, and so this Court will be so guided.[6]

ii.     **Whether Lancet May Disclaim Coverage Based on the Policy's Notice Provision**

---

[5] The Court notes that if Nevada had a similar applicable notice-prejudice statute or law it would not be preempted because the LRRA states that "the jurisdiction in which it is chartered may regulate the formation and operation of [risk retention groups]." Interestingly, neither party addresses Nevada's notice-prejudice statute, Nev. Admin. Code § 686A.660(4), which does not make clear whether it applies to claims-made-and-reported policies.

[6] Initially, Plaintiff argued that § 19-110 itself fell within the LRRA's exception as a statute governing interpretation of contracts. ECF No. 78-3. At the February 24, 2017 hearing, however, the Plaintiff refined his argument. Defendant agreed, and ultimately both parties argued that under Maryland common law, the Defendant would nonetheless need to prove actual prejudice with respect to the Insured's lack of cooperation.

Having determined that Maryland common law applies, the Court next turns to interpreting the notice and cooperation provisions of the instant insurance policy. First with regard to notice, the Policy states in pertinent part:

> Notifying us of an **Occurrence** or **Claim** does not provide coverage hereunder unless it contains: (a) written notice received by an **Insured,** and forwarded to us, from a person or entity, or on behalf of such person or entity by another party legally empowered to act on their behalf, alleging that such person or entity has been damaged by an **Insured** and demanding monetary damages or notifying the **Insured** of an intention to hold an **Insured** responsible for an **Occurrence**; or (b) the filing of a civil lawsuit or arbitration proceeding seeking monetary damages.

Insurance Policy, ECF No. 22-1 at 21 (emphasis in original).

Plaintiffs argue the Policy's notice requirement was satisfied when Plaintiffs provided Lancet written notice of their claims in July 2015, during the Policy's effective period. ECF No. 74-2 at 15. Lancet argues that such notice is insufficient because the Policy requires the notice to come from an insured, not a third party.

Here, with regard to the notice provision, § 19-110 would otherwise apply to this claims made and reported policy. *Navigators Specialty Ins. Co. v. Med. Benefits Adm'rs of MD, Inc.*, No. ELH-12-2076, 2014 WL 768822, at *15 (D. Md. Feb. 21, 2014) (concluding, after analyzing the Maryland case law discussing the issue, that "*Sherwood's* conclusion is crystal clear: Ins. § 19–110 applies to claims made-and-reported policies, . . ."). But as already explained, the LRRA preempts application of § 19-110.  This is especially so here, where the entire purpose of § 19-110 was to abrogate the common law rule on whether the insurer need demonstrate prejudice for failure to provide timely notice.  Accordingly, the actual prejudice requirement of § 19-110 does not apply to Lancet's notice provision.

The court is then left with whether third-party notice is sufficient to satisfy the Policy's notice requirement, which is a question of contract interpretation. The Court notes at the outset

that the Policy's notice provision is unclear that notice must be satisfied *only* by the insured. The policy states that notice is not satisfied "unless it contains" "written notice received by an Insured, and *forwarded to us*, from *a person or entity*, or on behalf of such person or entity by another party legally empowered to act on their behalf." ECF 22-1 at 2-1 (emphasis added).[7] The policy does not expressly state that the "person or entity" cannot be a third party such as Plaintiff who forwarded the information to Lancet. Moreover, the provision does not say that the notice received by an insured has to be forwarded to Lancet by that insured. Further, this is the only portion of the Policy which circumscribes the terms under which Lancet will "provide coverage" once the notice provisions are fulfilled. *Id.*

That this provision also goes on to state that "once an insured receives the items stated in A) or B) above, it is a condition precedent to your rights under this policy, that you give us immediate written notice," does not clarify the above stated terms.  Nowhere in the Policy is "rights under this policy" used or explained. *Cf.* Insurance Policy, ECF No. 75-1 at 33 ("you shall have the right, upon payment of an additional premium of 100% of the premium charged for the non-renewed or cancelled Policy, to an extension of the coverage . . . .").  Accordingly, "your rights" as used may or may not encompass "coverage hereunder." The Policy is, therefore, ambiguous that Insured notice is the only method by which Lancet can receive adequate notice under the Policy.

Importantly, it appears that Maryland has not been called to decide whether third-party notice as a matter of contract interpretation suffices in this instance. *Cf. Clinical Perfusionists, Inc. v. St. Paul Fire & Marine Ins. Co.*, 336 Md. 685, 693 (1994) (declining to decide whether third-party notice satisfied the notice requirement in an insurance contract). However, the

---

[7] Lancet seems to take the same view that Plaintiffs' July 2, 2015 letter put it on notice of the claims. ECF No. 76-14 at 3 ("Lancet first received notice of the Castillo incident on <u>July 2, 2015</u> through its receipt of the Letter" from Matthew P. Maloney, Esq.).

growing consensus in other jurisdictions is that third-party notice is sufficient to satisfy the notice provision of similar insurance contracts. *See, e.g.*, *Found. Reserve Ins. Co. v. Kelly*, 388 F.2d 528, 530 (10th Cir. 1968); *White v. Nationwide Mut. Ins. Co.*, 245 F. Supp. 1, 4 (W.D. Va. 1965), *aff'd*, 361 F.2d 785 (4th Cir. 1966).  This is so even where the insurance contract expressly provides that notice must be given by the insured. *Colonial Ins. Co. v. Barrett*, 208 W. Va. 706, 711 (2000); *Hansen v. Barmore*, 779 P.2d 1360, 1362 (Colo. App. 1989) (noting that the "vast majority of jurisdictions" have ruled that an insurance policy's notice provision can be satisfied "by an injured third party rather than the insured"); *Great Am. Ins. Co. v. Short*, No. E028861, 2001 WL 1264944, at *5 (Cal. Ct. App. Oct. 23, 2001) (citing cases). Whether third party notice satisfies the notice requirement is not "a question attracting widespread debate." *Hansen*, 779 P.2d 1360, 1362 (Colo. App. 1989).

Courts adhering to this rule hesitate to deny coverage when the third party's timely notice satisfied the two purposes of an insurance policy's notice provision: (1) to afford the insurer the opportunity to investigate the matter and (2) to enable the insurer to prepare adequately a defense if necessary. *White*, 245 F. Supp. at 4; *Hansen*, 779 P.2d at 1363 ("In satisfying this dual purpose, '[t]he question as to who gives the notice to the insurer is obviously of minor importance as long as notice is actually given of the occurrence of the accident or the pendency of the suit.'") (quoting 18 A.L.R. 2d 443 at 448 (1951)).

Lancet received a letter from Plaintiffs' counsel on July 2, 2015 notifying it of the claim for medical malpractice with an enclosed copy of Mr. Castillo's consultation note and bill related to the encounter in question. ECF No. 22 at 7; Letter, Ex. 8, ECF No. 75-3 at 14; ECF No. 74-2 at 15. Lancet then sent a letter to Dr. Malik informing him that "Lancet first received notice of the Castillo incident on July 2, 2015 through" a letter from Plaintiffs' counsel. ECF No. 76-14.

Before July 31, 2015, which is the date when the Policy expired, Lancet had received copies of all of the filings related to the Lawsuit. ECF No. 74-2 at 15–16; ECF No. 22-4; ECF No. 75-4 at 6. In its counterclaim, Lancet acknowledges receiving the above-mentioned correspondence from Plaintiffs' counsel. *See* Counterclaim, ECF No. 22 at 7–8.  Lancet  also acknowledges that upon receiving these notifications, it "immediately appointed defense counsel on behalf of the insured" and sent a letter to the Insureds on July 24, 2015 informing the Insureds of the lawsuit and explaining that its investigation was ongoing. *Id.* at 8. Lancet in this regard does not dispute that it received the actual lawsuit itself and knew the pendency of the claims. Accordingly, the Court finds that third party notice may suffice under the terms of this Policy. Further, when construing the facts in the light most favorable to the Plaintiffs, the notice requirement was met and thus Lancet cannot disclaim coverage on this basis.

**iii.      Whether Lancet May Disclaim Coverage Based on the Policy's Cooperation Provision**

Lancet's second policy defense is that the Insureds failed to cooperate with Lancet in the investigation and defense of the Lawsuit in violation of the Policy's cooperation provision and so it may rightfully deny coverage. The Policy states:

> The **Insured** must cooperate and assist the Company and the appointed defense counsel in all aspects of the investigation and defense . . . . Any failure of the **Insured** to cooperate that prejudices our ability to defend any **Claim**, shall void this **Policy**, nullify coverage and will disqualify the **Insured** from being eligible to exercise the option to purchase a Extended Reporting Period endorsement.

Insurance Policy, ECF No. 76-5 at 34.

It is undisputed that the Insureds failed to cooperate with Lancet. *See* Pl.'s Motion Summ. J., ECF No. 74-2 at 20. Lancet sought the Insureds' cooperation through multiple letters, e-mails and phone calls. It sent six separate letters to the Insureds and Dr. Malik to both Dr. Malik's

Maryland and Pakistan addresses over a seven-month period. ECF Nos. 76-14, -17, -19, -20, -21, -23. But despite its effort, the Insureds never responded to Lancet's communications or otherwise contacted Lancet. And given that Dr. Malik moved to Pakistan almost two years ago, it seems clear that Lancet will never secure the Insureds' cooperation.

However, just because the Insureds failed to cooperate with Lancet does not necessarily mean Lancet can disclaim coverage based on this provision. The Policy's cooperation provision, unlike its notice provision, explicitly states that before the insurer can disclaim coverage based on noncooperation, the insurer must demonstrate that the insured's lack of cooperation prejudiced Lancet. *See* Insurance Policy, ECF No. 76-5 at 34 ("Any failure of the Insured to cooperate *that prejudices our ability to defend any Claim*, shall void this Policy, . . .") (emphasis added). Determining what prejudice means in this context is thus question of contract interpretation and so is guided by Maryland common law.

The parties vigorously dispute whether Dr. Malik's failure to cooperate warrants summary judgment in either Plaintiff or Defendants' favor on the question of prejudice. Under Maryland law, the insurer bears the burden of proving prejudice arising from an Insureds' failure to cooperate. Prejudice is further defined as "whether the insured's willful conduct has, or may reasonably have, precluded the insurer from establishing a legitimate jury issue of the insured's liability, either liability *vel non* or from the damages award." *Allstate Co. v. State Farm*, 363 Md. 106, 127–28. In so proving, the insurer must show that "the failure of cooperation has, in a significant way, precluded or hampered it from presenting a credible defense to the claim." *Id.*[8]

---

[8] As the Maryland Court of Appeals recently explained, it has found actual prejudice in instances where the insured's breach has:

> precluded the insurer from establishing a legitimate jury issue or presenting potentially outcome-determinative evidence, *Allstate Ins. Co.*, 363 Md. at 127–30, 767 A.2d at 843–44; hampered the insurer from presenting a credible defense, *Allstate Ins. Co.*, 363 Md. at

Questions of prejudice are inherently fact driven, *see The Med. Protective Co. v. Bubenik*,

No. 4:06CV01639 ERW, 2008 WL 382384, at *5–6 (E.D. Mo. Feb. 12, 2008), and requires

review of a full and fair factual record prior to ruling. *State Farm Mut. Auto. Ins. Co. v.*

*Gregorie*, 131 Md. App. 317, 338 (2000), *vacated on other grounds by Allstate Ins. Co. v. State*

*Farm Mut. Auto. Ins. Co.*, 363 Md. 106 (2001).  This is because demonstrating "prejudice" often

does  not neatly fit into a precise set of circumstances, making it ill-suited for summary

judgment.

Lancet argues that the Insureds' total failure to cooperate from the outset of this case is so

egregious that no reasonable fact finder could conclude that it was not prejudiced. In support,

Lancet relies heavily on *Med. Assur. Co. v. Miller*, 779 F. Supp. 2d 902, 920 (N.D. Ind. 2011)

and *Med. Protective Co. v. Bubenik*, No. 4:06 CV01639 ERW, 2008 WL 5070042, at *29 (E.D.

Mo. Nov. 21, 2008), *aff'd*, 594 F.3d 1047 (8th Cir. 2010). Neither of these cases compels

granting of summary judgment in Lancet's favor.

First and most simply, *Bubenick* underscores that the question of prejudice here should

proceed to trial.  In *Bubenick*, the defendant dentist in a medical malpractice case almost totally

failed to participate in the defense on the underlying medical malpractice case. *The Med.*

*Protective Co. v. Bubenik*, No. 4:06CV01639 ERW, 2008 WL 382384, at *1 (E.D. Mo. Feb. 12,

2008). Dr. Bubenick, by invoking his Fifth Amendment right to remain silent, refused to answer

any questions—even of the insurance company funding his defense—on advice of his criminal

counsel. *Id.* However, the district court did not resolve the case on summary judgment in the

---

127–28, 767 A.2d at 843; or impeded an insurer's right to involvement or participation in
the litigation, *Prince George's Cnty. v. Local Gov't Ins. Trust*, 388 Md. 162, 190, 879
A.2d 81, 98 (2005); *Washington v. Federal Kemper Ins. Co.*, 60 Md. App. 288, 296, 482
A.2d 503 (1984).

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. The Fund for Animals, Inc.*, No. 18, 2017 WL
383453, at *9 (Md. Jan. 27, 2017).

insurer's favor despite Dr. Bubenick's total lack of cooperation similar to Lancet's predicament here. *Id.* at *6–7 (denying insurer's motion for summary judgment even though insured dentist completely failed to cooperate because the issue of prejudice is left to the trier of fact). The district court eventually, at a bench trial, determined that the insurance company "demonstrated that it suffered substantial prejudice as a result of Dr. Bubenik's conscious decision to assert his Fifth Amendment rights," *Bubenik*, 2008 WL 5070042, at *33 (E.D. Mo. Nov. 21, 2008), a decision later affirmed by the Eighth Circuit Court of Appeals, *Med. Protective Co. v. Bubenik*, 594 F.3d 1047, 1051 (8th Cir. 2010). Accordingly, *Bubenik* counsels in favor, rather than against, denying summary judgment for Lancet.

*Miller* admittedly makes this matter a closer call.  There, the court in a similar declaratory judgment action granted summary judgment in favor of the insurer where the insured-doctor's failure to cooperate in his defense deprived the insurer of "any ability to litigate the now-concluded [underlying malpractice suit] *at all.*" *Med. Assur. Co. v. Miller*, 779 F. Supp. 2d 902, 920 (N.D. Ind. 2011) (emphasis added). Informing the Court's determination was the prior trial court's ruling that because the doctor failed to participate in his deposition, the defense was barred from defending the case in any way." *Id.* The defense was further precluded by the trial court from contesting whether the doctor-insured's conduct was a proximate cause of the underlying injuries. Accordingly, the declaratory judgment court was presented with uncontroverted proof that the insurance company was *barred* from mounting any defense as to liability. Thus, as a matter of law, the insurers "lost their ability" to defend the case.

Here, the facts differ from *Miller* in several material respects.  First, unlike the insurer in *Miller*, Lancet also chose to do nothing with respect to the underlying malpractice case.  Lancet never hired counsel to defend the liability phase and simply did not participate at all. Second,

precisely because the insurer participated in the underlying malpractice trial, it developed a more robust record of how the failure of the insured's participation precluded the insurer's actual defenses. By contrast here, Lancet's proof on prejudice is undercut by its own lack of cooperation.

In highlighting this point, Plaintiffs note that Lancet never collected pertinent medical records from Plaintiffs' counsel, never attempted to have these medical records reviewed by a medical expert, and never attempted to speak with or depose Dr. Malik's colleagues, including Dr. Madden who was another named insured on the Policy. ECF No. 74-2 at 20. Thus, Plaintiff argues Lancet, and by extension this court, has no way of knowing the practical effect of Dr. Malik's absence on its ability to defend the case.

Plaintiff alternatively contends that even if Lancet participated in the Lawsuit, Dr. Malik's cooperation would not have materially impacted Lancet's defense. Plaintiffs note that Dr. Malik left behind detailed medical notes describing Mr. Castillo's examination. ECF No. 74-2 at 21–22. These notes, combined with testimony from other medical professionals working in the medical center that day and expert testimony, so say Plaintiffs, would have rendered Dr. Malik's testimony unnecessary. Plaintiffs also underscore that Dr. Malik's conduct was so medically indefensible, his participation in the litigation would not have changed the outcome of the trial. Accordingly, Plaintiffs argue, Lancet cannot sustain its burden of proving prejudice.

In support of this position, Plaintiffs underscore that participation at the underlying trial —which Lancet did not do—is necessary to determine the full impact of a missing defendant insured on the insurers ability to defend. *See Harleysville Ins. Co. v. Rosenbaum*, 30 Md. App. 74, 86 (1976); *Warren v. Hardware Dealers Mut. Fire Ins. Co.*, 244 Md. 471, 477 (1966). In both *Harleysville* and *Warren* the court required the insurer to defend the action in the insured's

absence, and only after trial, determined whether the insurer demonstrated actual prejudice from the insured's lack of cooperation. *Harleysville Ins. Co.*, 30 Md. App. at 84–86; *Warren*, 244 Md. at 477.

Lancet counters that its failure to participate in the underlying litigation stemmed from a total lack of cooperation from the doctor-insured. Amounting to a "why bother" argument, Lancet now claims essentially that it can demonstrate actual prejudice by raising the many potential ways the doctor's lack of cooperation hampered its ability to mount an adequate defense. *See* Def.'s Mot. Summ. J., ECF No. 76-1 at 22–23 (listing the questions Lancet would need to ask Dr. Malik to determine whether a credible defense exists).

Although the Court agrees that a fact finder may be persuaded by Lancet's arguments regarding the insured-doctor's absence hampering its defense, a fact finder may likewise be persuaded that Lancet cannot sustain its burden of demonstrating prejudice from the *insured*'s absence when prejudice may have been the result of *its own* absence. Further, because the question of prejudice is inherently fact driven, the facts currently are too thin or contested to determine that either party prevails as a matter of law. The Court cannot, for example, determine on this record whether a defense expert at the underlying malpractice trial could have provided a reasonable and admissible standard of care or causation opinion in the insured-doctor's absence. Nor can the Court choose between the competing proffered experts regarding the impact of the missing insured-doctor on the viability of Lancet's defense in the underlying medical malpractice case. *Compare* ECF No. 75-7 at 4–10 (Plaintiffs' experts), *with* ECF No. 76-24 and 76-25 (Lancet's experts). Accordingly on this record, the Court cannot and should not find as a matter of law that Lancet was prejudiced due to Dr. Malik's absence. Defendant Lancet's motion for summary judgment is therefore denied.

**B.      Plaintiffs' Motion for Summary Judgment**

Plaintiffs' motion for summary judgment is based on the same issues and facts which constituted Lancets grounds for summary judgment. Plaintiffs' specifically contend that Lancet, as a matter of law, failed to meet its burden that the Insureds breached the notice and cooperation provisions, and thus Lancet is liable for the judgment entered against the Insureds in the Lawsuit. For the reasons discussed above, Plaintiffs' motion is denied. While the Policy's notice provision was met as a matter of law, a genuine issue of material fact exists as to whether the Insureds' failure to cooperate prejudiced Lancet.

**IV.     CONCLUSION**

The Court finds that a factual dispute exists on the issue of whether the Insureds have breached the Policy's cooperation provision. Accordingly, both motions for summary judgment are denied. A separate order will follow.


 3/1/2017                                                              /S/                              
Date                                                          Paula Xinis
                                                             United States District Judge

21