IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CLAUDIA M. MORA et al.,

    Plaintiffs,

  v.                                            Civil Action No. PX 16-960

LANCET INDEMNITY RISK RETENTION
GROUP, INC.,

    Defendant.

**MEMORANDUM OPINION**

This case arises out of the unfortunate death of Juan G. Castillo, who suffered a fatal heart attack after Dr. Ishtiaq A. Malik treated Mr. Castillo at Dr. Malik's urgent care clinic in Silver Spring, Maryland. Mr. Castillo's wife and three children brought this declaratory judgment action against Dr. Malik's insurer, Lancet Indemnity Risk Retention Group, Inc. ("Lancet"), after Lancet disclaimed coverage in Plaintiffs' underlying medical malpractice action, citing Dr. Malik's failure to cooperate as sufficient basis to deny coverage.[1]

This Court's prior opinion and order on the parties' cross motions for summary judgment left one narrow issue for trial: whether Lancet could demonstrate that Dr. Malik's failure to cooperate prejudiced Lancet's ability to defend the underlying medical malpractice claim against Dr. Malik's entities. The Court held a two-day bench trial on July 18 and 20, 2017. The Court has heard the evidence, reviewed the exhibits, considered the materials submitted by the parties, and had the benefit of the arguments of counsel. It now issues this Decision as its findings of fact and conclusions of law in compliance with Rule 52(a) of the Federal Rules of Civil

---

[1] The following entities were named as defendants in the underlying malpractice action: Ishtiaq A. Malik, M.D., P.C.; Dr. Malik's medical practices, Advanced Walk-In Urgent Care, LLC and Union Multi-Care Medical Center, Inc.; and an entity owned by Mr. Castillo's prior physician, Dr. Richard O. Akoto. *See* Complaint, Pl.'s Ex. 17.

1

Procedure.[2] It finds the facts as stated in this opinion based upon evaluating the evidence, drawing all reasonable inferences, and assessing witness credibility. For the reasons set forth below, the Court finds that Plaintiffs/Counterclaim Defendants are entitled to a judgment declaring that Advanced Walk-In Urgent Care, LLC and Union Multi-Care Medical Center, Inc. are insured by Lancet under Policy Number L1201402002735 for the claims asserted against them in the underlying medical malpractice case brought before the Circuit Court of Montgomery County, Maryland, *Mora v. Advanced Walk-In Urgent Care, LLC*, Case No. 407276-V. The Court also finds that Lancet is thus liable for the money damages of its Insureds pursuant to the Policy's terms.

I. **PROCEDURAL BACKGROUND**

On March 2, 2016, Plaintiffs Claudia Mora, her two minor children, and her son, Juan Carlos Castillo ("Plaintiffs"), filed this declaratory judgment action in the Circuit Court for Montgomery County against Lancet Indemnity Risk Retention Group, Inc. ("Lancet"), Advanced Walk-In Urgent Care, LLC, Union Multi-Care Medical Center, Inc., and Dr. Richard Akoto in both his individual capacity and as a professional corporation (collectively, "Dr. Akoto"). *See* ECF No. 2. Plaintiffs ask the Court to declare that Defendant Lancet is required under its group professional liability insurance policy with Advanced Walk-In and Union Multi-Care to satisfy the judgment rendered against its Insureds and in favor of Plaintiffs in a medical malpractice case decided in the Circuit Court for Montgomery County.

---

[2] Rule 52(a) provides, in relevant part, that "[i]n an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately. The findings and conclusions . . . may appear in an opinion or a memorandum of decision filed by the court." To comply with this rule, the court "'need only make brief, definite, pertinent findings and conclusions upon the contested matters,' as there is no need for 'over-elaboration of detail or particularization of facts.'" *Wooten v. Lightburn*, 579 F. Supp. 2d 769, 772 (W.D. Va. 2008) (quoting Fed. R. Civ. P. 52(a) advisory committee's note to 1946 amendment). Rule 52(a) "does not require the court to make findings on all facts presented or to make detailed evidentiary findings; if the findings are sufficient to support the ultimate conclusion of the court they are sufficient." *Darter v. Greenville Cmty. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962) (quoting *Carr v. Yokohama Specie Bank, Ltd.*, 200 F.2d 251, 255 (9th Cir. 1952)).

Lancet removed the case to this Court on April 1, 2016 based on diversity of citizenship pursuant to 28 U.S.C. § 1332 and filed a counterclaim. ECF Nos. 1 & 22.[3] Through its counterclaim, Lancet asks this Court to declare its insurance agreement with the Defendants void because one of the policy's insureds, Dr. Ishtiaq Malik, failed to comply with the Policy's notice and cooperation provisions. ECF No. 22 at 15–16. Plaintiffs moved for summary judgment and Lancet filed a cross-motion for summary judgment. *See* ECF Nos. 74 & 76.

On March 1, 2017, the Court issued a Memorandum Opinion and Order denying both motions. *See* ECF Nos. 85 & 86. It concluded that Lancet could not disclaim coverage based on the insurance Policy's notice provision as a matter of law. However, factual disputes prevented the Court from deciding whether Lancet could disclaim coverage based on the insurance policy's cooperation provision.

On April 1, 2016, Plaintiffs moved to file a second amended complaint to clarify that the requested relief includes a monetary judgment up to the Policy limit of $1,000,000, plus post-judgment interest of $118,722.50. *See* ECF No. 93-3 at 9. The Court denied Plaintiffs' motion as moot on July 10, 2017, after the parties agreed at a telephonic hearing that Plaintiffs' failure to request monetary relief in the first amended complaint did not preclude Plaintiffs from recovering damages in the event that Plaintiffs prevail on the merits. *See* ECF No. 107. The parties therefore agreed to table the discussion of damages until the Court rendered a judgment on liability. Therefore, this Memorandum Opinion will only assess Lancet's liability under the Policy.

---

[3] On May 16, 2016, the parties jointly stipulated that Defendants Akoto, Advanced Walk-In, and Union Multi-Care should be realigned as plaintiffs because their interests align with those of the Plaintiffs. *See* ECF No. 61. This left Lancet as the only defendant in the case. Dr. Akoto's counsel then withdrew their appearance and Dr. Akoto has not participated in the litigation since. Advanced Walk-In and Union Multi-Care never entered appearance and have not participated in the case.

## II. FINDINGS OF FACT

*A. The Policy*

Defendant Lancet Indemnity Risk Retention Group, Inc. ("Lancet") is a risk retention group chartered in Nevada and organized pursuant to the Liability Risk Retention Act ("LRRA"), 15 U.S.C. §§ 3901 *et seq.* Risk retention groups are different than other insurance companies because they must be owned by their insureds and their members are relatively homogeneous. For example, Lancet only insures medical professionals and is owned and funded by the physicians in the group. *See* Trial Tr., 27, July 18, 2017 (Teter Testimony).

In 2014, Lancet issued a claims-made-and-reported policy[4] ("Policy") to Union Multi-Care Medical Center, Inc. ("Union Multi-Care") and Advanced Walk-In Urgent Care, LLC ("Advanced Walk-In"), both located in the same office in Silver Spring, Maryland. *See* Policy, Def.'s Ex. 1. Dr. Ishtiaq A. Malik ("Dr. Malik") owned and operated both practices. He and his colleague, Dr. Lendicta Q. Madden ("Dr. Madden"), were named as additional Insureds in the Policy.[5] *See* Def.'s Ex. 1 at 12. The Policy commenced on July 1, 2014 and expired on July 1, 2015. *Id.* at 2.

The Policy contains a "Cooperation and Assistance" clause which states, in pertinent part:

> The **Insured** must cooperate and assist the Company and the appointed defense counsel in all aspects of the investigation and defense; and shall, upon request, submit to examination and interrogation by a representative of the Company, under oath if required, attend hearings, depositions and trials, assist in effecting any settlement, securing and giving evidence, and obtaining the attendance of witnesses, all without charge to the Company.

---

[4] A claims-made-and-reported policy is a policy in which a claim must be both made against the insured and reported to the insurer during the policy period for coverage to apply.

[5] Union Multi-Care, Advanced Walk-In, and Dr. Malik will collectively be referred to as the "Insureds" for the remainder of this Opinion. Although Dr. Madden is also a named insured under the Policy, her conduct is not at issue in this case.

4

> The **Insured** shall further cooperate with the Company to do whatever is necessary to secure and affect any rights of indemnity, contribution or apportionment that the **Insured** may have. Any failure of the **Insured** to cooperate that prejudices our ability to defend any **Claim**, shall void this **Policy**, nullify coverage and will disqualify the **Insured** from being eligible to exercise the option to purchase a Extended Period endorsement.

Def.'s Ex. 1 at 34 (emphasis in original).

The Policy also includes an advance consent provision. This provision operates independently of the notice and cooperation provision, and states in pertinent part, that Lancet "ha[s] the right and duty to defend any **Claim** covered by the **Policy**." Def.'s Ex. 1 at 15 (emphasis in original).

### B. *The Underlying Medical Malpractice Action*

On January 15, 2015, Juan G. Castillo visited Dr. Malik at Advanced Walk-In seeking treatment for chest pains. *See* Trial Tr., 182–83, July 20, 2017 (Castillo Testimony). Dr. Malik had not previously treated Mr. Castillo. Mr. Castillo was not conversant in English, and Dr. Malik did not speak any Spanish, Mr. Castillo's native tongue. Under these circumstances, Dr. Malik's practice was to ask one of Advanced Walk-In's bilingual staff members to be present at the appointment and translate for him. *See* Trial Tr., 77, July 20, 2017 (Madden Testimony). However, no direct evidence established whether a bilingual staff member translated for Dr. Malik during the January 15 appointment with Castillo.

During the same appointment, Dr. Malik prepared a short consultation note explaining his physical assessment of Mr. Castillo, the diagnostic tests administered, and Dr. Malik's proposed follow-up care for Mr. Castillo. *See* Def.'s Ex. 2. The consultation note explains that Castillo complained of atypical chest pain and shortness of breath a few times a day. Dr. Malik conducted both a treadmill stress test and an electrocardiogram ("EKG"). The treadmill stress test had to be

5

stopped after only three minutes because, according to the consultation note, Mr. Castillo was experiencing chest pain. *Id.* Dr. Malik then prescribed Mr. Castillo Metoprolol, a common beta blocker used to treat chest pain, and rendered no further treatment. Trial Tr., 212, July 18, 2017 (Schwartz Testimony). Eight days later, Mr. Castillo died from a sudden cardiac event while at work.

After Mr. Castillo's death, his widow, Claudia Mora, and her children ("Plaintiffs") prepared to file a medical malpractice claim against the Union Multi-Care, Dr. Malik, P.C., and possibly Advanced Walk-In, as well as Castillo's regular treating cardiologist, Dr. Akoto. On July 2, 2015, Plaintiffs' counsel notified Lancet in writing of the impending suit. *See* Def.'s Ex. 7. Plaintiffs' counsel also attached to that letter Dr. Malik's consultation notes from Castillo's visit and the invoice for services. *Id.*

Lancet's claims representative, Mr. Christopher Teter, immediately reviewed the Insured's Policy and assigned defense counsel, Mr. Brad Kelly, to defend the malpractice action. *See* Trial Tr., 28, July 18, 2017 (Teter Testimony). Teter and Kelly attempted to call Dr. Malik, sent him several emails, and sent letters to Advanced Walk-In's business address. *Id.* at 28–29. Dr. Malik did not respond.

On July 15, 2015, Plaintiffs filed a medical malpractice claim against Dr. Malik, P.C., Advanced Walk-In, Union Multi-Care, and the professional corporation associated with Mr. Castillo's prior physician, Dr. Richard Akoto, with the State of Maryland Health Claims Alternative Dispute Resolution Office ("HCADRO"). In that action, the Plaintiffs alleged that Dr. Malik negligently failed to refer Mr. Castillo to a cardiologist after evaluating him, leaving Castillo's heart condition undiagnosed and untreated, resulting in his death.

On July 24, 2015, Plaintiffs filed a medical malpractice/wrongful death case in the Circuit Court for Montgomery County, naming as defendants the Insureds and Dr. Akoto. *See Mora v. Advanced Walk-In Urgent Care LLC*, Case No. 407276-V (Montgomery Cnty. Cir. Ct. filed July 24, 2015) [hereinafter the "Malpractice Lawsuit"]. That same day, Teter sent a letter to Dr. Malik informing him that Lancet: (i) received the July 2, 2015 letter from Plaintiffs; (ii) appointed defense counsel on the Insureds' behalf; (iii) defense counsel required the Insureds and Dr. Malik's assistance and cooperation in discussing the allegations of the July 2, 2105 letter; and (iv) Lancet's investigation remained ongoing and defense under the Policy was being provided under a strict reservation of rights. *See* Def.'s Ex. 8; *see also* Trial Tr., 60–61, July 18, 2017 (Teter Testimony). Dr. Malik did not respond to this letter.

Although Kelly was initially hired as defense counsel for Dr. Malik and the other Insureds, Kelly never entered his appearance in the underlying Malpractice Lawsuit. Trial Tr., 84, July 18, 2017 (Kelly Testimony). At trial before this Court, Kelly explained that he did not enter his appearance because he never spoke to Dr. Malik and thus never obtained his consent to represent him. *Id.* at 85. He further stated that he could not, and would not, represent Dr. Malik because doing so without consent would constitute an ethical violation and subject Kelly to professional liability. *Id.* at 85–86. Kelly was silent, however, on whether he could or should represent Lancet's interests as the Insurer since such representation would seemingly be consistent with the advance consent provision in the Policy.

At the same time, Teter made multiple attempts to contact Dr. Malik. On August 6, 2015, Teter sent Dr. Malik correspondence to remind him of the July 24th letter and inform him that his failure to cooperate with Lancet during their coverage investigation was a violation of the Policy's cooperation provision. *See* Def.'s Ex. 9. Lancet also contacted Dr. Malik's former

7

counsel in an unrelated False Claims Act action, who informed Lancet that Dr. Malik had moved to Pakistan and did not intend on returning to the United States. Teter sent two more letters to Dr. Malik's last known address in Silver Spring, Maryland, on August 27, 2015 and October 6, 2015. *See* Def.'s Ex. 10, 11. Dr. Malik failed to respond to any of these letters or otherwise contact Lancet. Additional emails and phone calls to Dr. Malik also went unanswered. Accordingly, on October 16, 2015, Teter sent another letter to Dr. Malik stating that because Dr. Malik failed to comply with his obligations under the Policy, Lancet was disclaiming coverage with respect to the Malpractice Lawsuit. *See* Def.'s Ex. 12 at 6. The letter also informed Dr. Malik that "Lancet is withdrawing the defense that was being provided to you under a strict reservation of rights." *Id.*

On February 1, 2016, Plaintiffs' counsel informed Lancet in writing that he had learned of Dr. Malik's whereabouts in Pakistan and provided Lancet with two possible Pakistani addresses. Lancet then sent correspondence on February 26, 2016 to both addresses, referencing Lancet's prior attempts to communicate with him. Lancet informed Dr. Malik that because Lancet was unable to reach him to investigate and defend against the claims in the Malpractice Lawsuit, Lancet disclaimed coverage. *See* Def.'s Ex. 13.

Thereafter, Lancet never participated in the Malpractice Lawsuit despite the suit's infancy. No attorney entered an appearance for the Insureds, nor did Lancet take any further action to investigate or defend against the claims prior to denying coverage. Specifically, Lancet did not answer the complaint, made no effort to obtain records, and did not retain medical experts or interview any of the employees at Advanced Walk-In at the time of Mr. Castillo's appointment. Trial Tr., 59–60, July 18, 2017 (Teter Testimony).

In February 2016, Plaintiffs filed a Request for Entry of an Order of Default against the Insureds, and the Order was granted on March 11, 2016. A copy of this Order was mailed to Lancet and to its outside counsel with a cover letter notifying them that they had thirty days to move to vacate that Order pursuant to Md. Rule 2-613(d).

The Circuit Court then scheduled an *ex parte* damages hearing on August 11, 2016. Plaintiffs' counsel informed Lancet of the hearing by a letter dated July 15, 2016. On August 8, 2016 – and despite Lancet's purposeful previous failure to participate in the liability phase of the action – Lancet requested leave to intervene in the damages phase. The motion was unopposed and granted. Lancet also sought to postpone the *ex parte* damages hearing and was denied. Ultimately, the Circuit Court entered judgment against the Insured, jointly and severally, for $2.56 million.

## III. DISCUSSION

Plaintiffs seek a declaration pursuant to the Maryland Declaratory Judgment Act, Md. Code Ann., Cts. & Jud. Proc. §§ 3-401 *et seq.*, that pursuant to the terms of the Policy, Lancet is required to pay all money damages that the Insureds incurred in the Malpractice Lawsuit. In contrast, Lancet seeks a judgment pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Policy does not obligate Lancet to provide coverage for the claims asserted in the Malpractice Lawsuit and that the Policy is void because of Dr. Malik's failure to cooperate.[6]

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon filing of an appropriate pleading, may declare the rights and legal relations of any interested party seeking such declaration, whether or

---

[6] The parties do not argue that different standards apply under Md. Code Ann., Cts. & Jud. Proc. §§ 3-401 *et seq.* and 28 U.S.C. § 2201. Thus, the analysis here does not differentiate between the two bases for declaratory relief.

not further relief is or could be sought." 28 U.S.C. § 2201. Three criteria must be met before the Court may exercise jurisdiction over a declaratory judgment action: (1) the complaint [must] allege[] an "actual controversy" between the parties "of sufficient immediacy and reality to warrant issuance of a declaratory judgment;" (2) the court [must] possess[] an independent basis for jurisdiction over the parties (e.g., federal question or diversity jurisdiction); and (3) the court [must] not abuse its discretion in its exercise of jurisdiction. *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 592 (4th Cir. 2004). All three criteria are met here. An actual controversy exists between Plaintiffs, as injured third parties to the insurance contract, and the insurer, Lancet, regarding the extent of Lancet's coverage responsibilities under the Policy. *See O'Bannon v. Friedman's, Inc.*, 437 F. Supp. 2d 490, 494 (D. Md. 2006) (confirming that a dispute between a liability insurer and an injured third party regarding coverage responsibilities presents an actual controversy for purposes of the Federal Declaratory Judgment Act). The Court possesses diversity jurisdiction over this controversy, and no good reason exists to decline exercise of jurisdiction. *Cf. Volvo Constr. Equip. N. Am. Inc.*, 386 F.3d at 594 (explaining that "a district court must have 'good reason' for declining to exercise its declaratory judgment jurisdiction.").

> Turning to the merits, the Policy's cooperation provision reads, in pertinent part:
>
> The Insured shall further cooperate with the Company to do whatever is necessary to secure and affect any rights of indemnity, contribution or apportionment that the Insured may have. *Any failure of the Insured to cooperate that prejudices our ability to defend any Claim*, shall void this Policy, nullify coverage and will disqualify the Insured from being eligible to exercise the option to purchase a Extended Period endorsement.

Def.'s Ex. 1 at 34 (emphasis added).

It is undisputed that Dr. Malik, who is an additional Insured on the Policy, failed to cooperate with Lancet. The question remaining, therefore, is whether Dr. Malik's failure to

cooperate "prejudice[d] [Lancet's] ability to defend" the claims made by Plaintiffs in the underlying medical malpractice case. *Id.* This necessitates a definition of the word "prejudice" as it is used in the Policy. Per agreement of the parties, and by dint of this Court's prior choice of law analysis, *see* ECF No. 85, the Court will apply Maryland law.

Maryland courts interpret the language of an insurance policy with the same principles and rules of construction used to interpret other contracts. *Connors v. Gov't Employees Ins. Co.*, 442 Md. 466, 480 (2015). Like any other contract, an insurance contract is "measured by its terms unless a statute, a regulation, or public policy is violated thereby." *Id.* (quoting *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388 (1985)). The words of insurance contracts are given their customary, ordinary, and accepted meaning, as determined by the fictional "reasonably prudent lay person." *Id.* (quoting *Beale v. Am. Nat'l Lawyers Ins. Reciprocal*, 379 Md. 643, 660 (2004)). When contractual language is plain and unambiguous, Maryland courts enforce the terms of the contract as a matter of law. *Calomiris v. Woods*, 353 Md. 425, 445 (1998); *Pacific Indem. Co.*, 302 Md. at 389.

To determine the accepted meaning of term "prejudice" in this case, the Court is guided by Maryland Courts interpretation of the term "actual prejudice" as found in Maryland's "notice-prejudice" rule, Md. Ins. Code Ann. § 19-110. Section 19-110 provides:

> An insurer may disclaim coverage on a liability insurance policy on the ground that the insured or a person claiming the benefits of the policy through the insured has breached the policy by failing to cooperate with the insurer or by not giving the insurer required notice only if the insurer establishes by a preponderance of the evidence that the lack of cooperation or notice has resulted in *actual prejudice* to the insurer.

Md. Ins. Code Ann. § 19-110 (emphasis added).

As the Court noted in its prior Memorandum Opinion,[7] the applicable law in this case is a vexing issue. At first blush, § 19-110 appears not to apply to the Policy because Lancet is a risk retention group governed by the Liability Risk Retention Act ("LRRA"). The LRRA provides that risk retention groups are only subject to the insurance laws of its chartering state, save for a few limited exceptions. *Nat'l Home Ins. Co. v. State Corp. Comm'n of Com. of Va.*, 838 F. Supp. 1104, 1109–10 (E.D. Va. 1993). Lancet is chartered in Nevada and so Maryland's statute itself cannot reach Lancet.

Critically, however, the LRRA carves out an exception to this general rule for the laws of a non-chartering state which govern the interpretation of insurance contracts. Section 3901(b) of the LRRA provides:

> Nothing in this chapter shall be construed to affect either the tort law or *the law governing the interpretation of insurance contracts of any State*, and the definitions of liability, personal risk liability, and insurance under any State law shall not be applied for the purposes of this chapter, including recognition or qualification of risk retention groups or purchasing groups.

15 U.S.C. § 3901(b) (emphasis added).

Accordingly, the LRRA's exception would permit this court to apply §19-110. Alternatively, the Policy chose to adopt a prejudice prong to its cooperation provision but nowhere defines what the parties mean by "prejudice." The Court must therefore look to Maryland case law interpreting the term "prejudice" to guide its decision on the accepted meaning of the term.

The parties agree that there is no difference in the meanings of the terms "actual prejudice" in §19-110 and "prejudice" as the term is used in the Policy. Both parties relied upon cases published after §19-110 was passed to interpret "actual prejudice." *See, e.g.* ECF No. 100 at 5; ECF No. 101 at 3–4. This is for good reason. In *Allstate Ins. Co. v. State Farm Mut. Auto.*

---

[7] *Mora v. Lancet Indem. Risk Retention Grp., Inc.*, No. PX 16-960, 2017 WL 818718 (D. Md. Mar. 1, 2017).

*Ins. Co.*, 363 Md. 106 (2001), the Maryland Court of Appeals thoroughly analyzed nearly fifty years of jurisprudence in relation to §19-110, and effectively pronounced that the common law and §19-110 definition of "prejudice" are the same. The Maryland Court of Appeals explained that the General Assembly enacted §19-110 to end confusion in the common law surrounding the notice and prejudice standards. *Allstate*, 363 Md. at 122 ("The General Assembly responded to the *Watson* case, and also, perhaps, to the *Indemnity Ins. Co.* case, by enacting, in its 1964 session, what is now § 19-110 of the Insurance Article.") (citing *St. Paul Fire & Marine Ins. v. House*, 315 Md. 328, 332 (1989)). The *Allstate* Court explained:

> The statute at least has wiped away any basic distinctions with respect to whether prejudice is required. An insurer may not disclaim coverage for either lack of notice or failure to cooperate unless it demonstrates that the deficiency has resulted in actual prejudice to the insurer. Anything to the contrary in our pre 1964 case law is no longer valid.

*Id.* After *Allstate*, therefore, it appears that when interpreting the contractual term "prejudice," looking to § 19-110 or Maryland case law will produce the same result.

*Allstate* also announced that the prejudice determination must focus on "whether the insured's wilful [sic] conduct has, or may reasonably have, precluded the insurer from establishing a legitimate jury issue of the insured's liability, either liability *vel non* or for the damages awarded." *Id.* at 127–28. This standard does not require the insurer to meet "almost insurmountable burden of proving that the verdict was the result of the lack of cooperation." *Id.* at 128 (internal quotations and citation omitted). Rather, the insurer must show "that the failure of cooperation has, in a significant way, precluded or hampered it from presenting a credible defense to the claim." *Id.* Importantly, the Maryland Court of Appeals later clarified that "actual prejudice" contemplates harm that is "more than possible, theoretical, hypothetical, speculative, or conjectural." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Fund for Animals, Inc.*, 451 Md.

431, 454 (2017). The insurer bears the burden of demonstrating that the insured's failure to cooperate prejudiced it. *Prince George's Cty. v. Local Gov't Ins. Tr.*, 388 Md. 162, 187–88 (2005) ("The insurer bears the burden of proof to show prejudice . . . . Courts have identified four rationales for allocating the burden to the insurer. First, it is more equitable for the insurer to bear the burden because the insurer seeks to disclaim the coverage. Second, it is more difficult for the insured to prove a negative, that there was no prejudice, than for the insurer to prove a positive, that there was prejudice. Third, the insurer is in a superior position to produce evidence that it suffered prejudice. Finally, allocating the burden to the insurer encourages the insurer to undertake a timely preliminary investigation.") (internal citations omitted).

Here, Lancet has failed to sustain this burden. Lancet claims prejudice from Dr. Malik's absence from the outset of the case, and principally relies on the testimony of Brad Kelly. Mr. Kelly believed himself hamstrung in defending the case because he could not enter his appearance on behalf of Dr. Malik. But as Plaintiffs' malpractice expert, Albert Brault, explained, Kelly is only half right. Brault, whose experience and credentials are unmatched in the area of Maryland medical malpractice defense,[8] opined that defense counsel can and do represent both the insured's and the insurer's interests in the litigation, so long as those interests coincide. *See, e.g.*, Trial Tr., 148, July 20, 2017 (Brault Testimony). This dual representation, Brault explains, fosters the overarching goal of promoting coverage for valid insurance claims. *Id.* at 127. If this dual representation becomes conflicted, the attorney must choose to represent

---

[8] Mr. Brault was admitted to the Maryland bar in 1959, and soon thereafter began practicing insurance defense. Mr. Brault has handled hundreds of medical malpractice defense cases. He is a Fellow of the American College of Trial Lawyers, of which he was Maryland State Chair from 1998–2000, and acted as chairman of the Appellate Courts Judicial Selection Commission of Maryland from 1990–2000 and chairman of the Qualifications Committee for Admission to the United States District Court for the District of Maryland from 1985–88. Mr. Brault served on the Rules Committee of the Court of Appeals for the Maryland Bar from 1973–2013. He has received numerous awards in recognition of his impressive litigation career and presented medical malpractice and general litigation lectures before the American Bar Association, Georgetown University Law Center, Maryland State Bar Association, American Board of Trial Advocates, and University of Maryland School of Law, amongst others. *See* Pl.'s Ex. 18.

either the insurer or insured, and advise the other to retain independent counsel. *See generally* Md. R. Attorneys, Rule 19-301.8. *See also* Trial Tr., 148, July 20, 2017 (Brault Testimony). Brault advised that where the conflict arises from a failure of the insured to cooperate, the attorney must nonetheless vigorously defend on behalf of the insurer, and protect its potential denial of coverage by issuing a reservation of rights letter. *Id.* at 149. This is precisely why the Policy, as do all standard insurance policies, require the insured to give advance consent "that allows the insurer to defend itself . . . [o]therwise, the insurance company would be totally dependent on a doctor," and unable to "to control the defense itself." *Id.*

The Policy expressly provides for this possibility by granting Lancet "the right and duty to defend any Claim covered by the Policy." Def.'s Ex. 1 at 15. *See also* Trial Tr., 151, July 20, 2017 (Brault Testimony). Lancet's refusal to defend at the outset not only falls below the generally accepted practice in Maryland, but runs contrary to the plain language of Lancet's own insurance policy – language Brault calls "standard" and "boilerplate" – to defend the claims even in the absence of the insured's consent.[9] Accordingly, even if Dr. Malik's conduct frustrated Lancet's ability to represent the Insureds in the Malpractice Lawsuit, nothing prevented Lancet from entering an appearance to defend the case on its own behalf. In fact, Lancet did just that when it entered an appearance on the issue of damages shortly after the Circuit Court entered a default judgment against the Insureds. Lancet's own conduct, therefore, belies its argument that it was prejudiced by Dr. Malik's lack of cooperation. Rather, Lancet is prejudiced by its own choice not to defend the action from the outset.[10]

---

[9] William Artz, Lancet's medical malpractice expert, was never asked expressly about the advance consent provision, but interestingly Artz noted that Lancet could have hired another lawyer to enter an appearance in the case to "do what he could" to defend the claims. Trial Tr., 115, July 18, 2017 (Artz Testimony).

[10] Lancet also stresses that it was prejudiced by its inability to settle the case without Dr. Malik because the Policy requires the Insured's consent before a settlement can be consummated. *See* Trial Tr., 137–38, July 20, 2017 (Brault Testimony); *see also* Policy, Def.'s Ex. 1 at 15. This is a red herring. As Brault emphasized. Lancet *always* had the

15

Lancet next argues that even if it had chosen to pursue the litigation, Dr. Malik's absence would have hamstrung Lancet on defending against Malik's violation of standard of care. Lancet's experts stated that without Dr. Malik, Lancet could not ascertain important details about Dr. Malik's assessment of Castillo, why Dr. Malik stopped the stress test, how the doctor interpreted the test results, or whether he provided Mr. Castillo with any follow-up instructions. *See* Trial Tr., 115, July 18, 2017 (Artz Testimony). Thus, on the current state of the record insufficient evidence exists to determine whether Dr. Malik's conduct fell below the standard of care. *See id.* at 116–18.

The critical fallacy in Lancet's case, however, is that it *chose* not to participate in the litigation at all. As a result, any claim that Dr. Malik's absence harmed Lancet's defense is by definition nothing "more than possible, theoretical, hypothetical, speculative, or conjectural." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Fund for Animals, Inc.*, 451 Md. 431, 454 (2017). In essence, Lancet's arguments force the Court to theorize about the possible outcomes regarding the impact of Dr. Malik's absence at trial. *Compare* Trial Tr. 142–44, July 18, 2017 (Artz Testimony) (conceding uncertainty as to Circuit Court's possible sanction for Malik's failure to cooperate) *with Allstate Ins.*, 363 Md. at 128–30 (emphasizing that trial court's actual exclusion of evidence based on Plaintiff's sanctions motion as evidence of actual prejudice).

Further, Lancet's argument that Malik's absence hindered its defense on standard of care is also belied by its own evidence. Lancet vigorously pressed, through its medical expert, cardiologist Dr. Richard Schwartz, that the state of the evidence absent Malik would be insufficient to establish one way or the other whether Malik violated the standard of care, *See* Trial Tr., 118, July 18, 2017 (Schwartz Testimony). But Lancet overlooked that this is itself a

---

ability to defend, and thus settle, on *its own behalf*. Not being able to settle for the absent Insured does nothing to undermine its own settlement authority. *See* Trial Tr., 136–44, July 20, 2017 (Brault Testimony).

16

credible defense to the Malpractice Lawsuit. Because – according to Lancet – little evidence exists as to what the doctor did *at all*, Plaintiff had precious little to sustain its burden that Malik's conduct violated the standard of care. Lancet could have certainly defended their claims on this basis.

On the other hand, Dr. Alec Anders, Plaintiff's expert on emergency medicine in the urgent care setting, plausibly testified that the medical records alone provided sufficient evidence for medical experts to opine on standard of care. *See* Trial Tr., 39–43, July 18, 2017 (Anders Testimony). This is so because Dr. Malik made contemporaneous notes reflecting his diagnostic impressions, course of care, and follow-up plan. *See Id.* at 43–44. Doctors are trained in creating such notes and to include in the notes all important information concerning diagnosis, prognosis, and plan of action. *Id.* This training is why doctors live by the adage "if it wasn't documented, it didn't happen." *Id.* at 44. Moreover, one of the stated purposes of these notes is so that doctors subsequent to a patient can rely on the information contained in the note to treat the patient. *Id*. at 41. Thus, when considered against the backdrop of how doctors are trained to create and maintain such notes, Dr. Anders' testimony that Dr. Malik's notes provide sufficient basis to opine on standard of care is persuasive. Further, Dr. Anders noted that while factual gaps may have been filled by interviewing witnesses at the urgent care clinic, other treatment records, or the autopsy report, none materially alter his ability to opine on standard of care. *Id.* at 51–64, 67–68.

As a result, Lancet failed to sustain its burden of showing that Dr. Malik's absence *in fact* and "in a significant way … precluded or hampered it from presenting a credible defense to the claim." *Allstate* at 128. Quite the opposite, two of Lancet's experts demonstrated that Lancet had a viable standard of care defense because the lack of sufficient record evidence rendered

17

baseless *any* expert opinion on standard of care. *See* Trial Tr., 202–05, Jul. 18, 2017 (Schwartz Testimony); Trial Tr., 162–63, July 18, 2017 (Artz Testimony). Plaintiffs' expert, by contrast, persuasively opined that the record evidence was sufficient to render a standard of care opinion. *See* Trial Tr., 40–45, July 18, 2017 (Anders Testimony). Accordingly, regardless of which expert this Court credits, Lancet has not demonstrated Malik's absence (as opposed to its own choice not to participate) prejudiced its ability to defend the case.

Perhaps Lancet's strongest argument for actual prejudice from Malik's absence is having to proceed to trial with an "empty chair," i.e., an absent defendant. *See* Trial Tr., 112–13, July 18, 2017 (Artz Testimony). The empty chair, asserted Lancet's expert, would have left the jury to speculate adversely as to why Malik did not post for his own trial. *Id.* But again, Lancet offered no proof of actual prejudice regarding the impact of Malik's physical absence because Lancet chose not to defend the claim at all. The Court, therefore, is left with competing expert testimony as to how the Circuit Court *could have* handled Malik's absence rather than how the Circuit Court *did* handle it. *Compare* Trial Tr., 112, July 18, 2017 (Artz Testimony) (opining that absence could have resulted in default judgment or sanctions) *with* Trial Tr., 131, July 20, 2017 (Brault Testimony) (opining that court could give cautionary instruction for jury not to concern themselves with doctor's physical absence at trial). This expert tit-for-tat amounts to no more than hypothetical outcomes, not evidence of actual prejudice. Accordingly, Lancet has shown that any prejudice was derived from Dr. Malik's absence, but rather from Lancet's choice to sit on its hands. As the plaintiff's expert, Mr. Brault, so aptly stated, "the reason [Lancet] couldn't present a defense is because of what [Lancet] did. They did not investigate. They did not get an expert. They did not attempt to develop a defense. Instead, they did nothing, and the result under Maryland procedural law at that time is the time had run out and they couldn't

18

present [a defense] even if they belatedly got one." Trial Tr., 133, July 20, 2017 (Brault Testimony). Indeed, in light of the emphasis that post-*Allstate* jurisprudence places on incentivizing insurers to undertake timely investigations *before* alleging prejudice, *see, e.g., Prince George's Cty. v. Local Gov't Ins. Tr.*, 388 Md. 162, 187–88 (2005), this Court cannot endorse Lancet's abdication of this undertaking in the Malpractice Lawsuit.

## IV. CONCLUSION

For the reasons stated above, judgement will be entered in favor of Plaintiffs/Counterclaim Defendants Claudia Mora, her two minor children, and her son, Juan Carlos Castillo. The Court thereby DECLARES that Advanced Walk-In Urgent Care, LLC and Union Multi Care Medical Center, Inc. are insured by the Lancet Indemnity Risk Retention Group Professional Liability Insurance Policy # L1201402002735 for the claims asserted against them in the case *Mora v. Advanced Walk-In Urgent Care, LLC*, No. 407276-V (Montgomery Cnty. Cir. Ct. filed July 24, 2015). Lancet is thus liable for the money damages of its Insureds pursuant to the Policy's terms. Lancet is not entitled to the declaration sought in its counterclaim. A separate Order will follow.

| | |
|---|---|
| 10/16/2017 | /s/ |
| Date | Paula Xinis<br>United States District Judge |